# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### June 2, 2016 Session Heard at Nashville

## STATE OF TENNESSEE v. JAMES ROBERT CHRISTENSEN, JR.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Tipton County**
**No. 7799        Joseph H. Walker III, Judge**

_____

### No. W2014-00931-SC-R11-CD – Filed April 7, 2017

_____

James Robert Christensen, Jr., ("the Defendant") was convicted by a jury of resisting arrest, promoting the manufacture of methamphetamine, initiating the manufacture of methamphetamine, and two counts of possession of a firearm during the commission of a dangerous felony. Prior to trial, the Defendant moved to suppress evidence obtained through what he claimed was an illegal search. The trial court denied the Defendant's motion and also denied the Defendant's motion seeking an interlocutory appeal. On direct appeal following trial, the Court of Criminal Appeals affirmed the trial court's judgments, including the trial court's ruling on the suppression issue. We granted the Defendant's application for permission to appeal in order to address the legality of the police officers' warrantless entry onto the curtilage of the Defendant's residence. We hold that the officers' entry onto the Defendant's property was constitutionally permissible in spite of the posted "No Trespassing" signs near the Defendant's unobstructed driveway. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Affirmed

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined. SHARON G. LEE, J., filed a dissenting opinion. ROGER A. PAGE, J., not participating.

Charles A. Brasfield (at trial and on appeal) and Amber G. Shaw (at trial), Covington, Tennessee, for the appellant, James Robert Christensen, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Rachel E. Willis, Senior Counsel; Caitlin Smith, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## Factual and Procedural Background

In August 2013, two law enforcement officers drove down the Defendant's unobstructed driveway, parked near his residence, and walked up to the Defendant's front porch. The Defendant opened his front door, stepped onto his porch, and closed and locked the front door behind him. After the Defendant opened his door, the officers smelled the odor of methamphetamine being manufactured. They asked the Defendant for consent to enter his residence, but the Defendant refused to give consent. One of the officers then forced open the front door, while the other officer detained the Defendant. Inside the residence, the entering officer discovered an active methamphetamine lab, along with several inactive labs, various items commonly associated with the manufacture of methamphetamine, and several guns. The Defendant subsequently was indicted on one count each of resisting arrest, promoting the manufacture of methamphetamine, and initiating the manufacture of methamphetamine, and two counts of possession of a firearm during the commission of a dangerous felony.

Prior to trial, the Defendant filed a motion to suppress evidence, claiming that the evidence had been seized as the result of an unlawful search because he had posted "No Trespassing" signs near his driveway. The Defendant asserted that the officers' entry onto his property without a warrant violated both the United States and Tennessee Constitutions. After a hearing, the trial court denied the motion. The Defendant then filed a motion for interlocutory appeal, which the trial court also denied. Accordingly, the Defendant proceeded to a jury trial, and he was convicted as charged. The Court of Criminal Appeals affirmed the Defendant's convictions and sentences. State v. Christensen, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *11 (Tenn. Crim. App. May 14, 2015).[1]

---

[1] Judge John Everett Williams filed a separate opinion, concurring in part and dissenting in part. See Christensen, 2015 WL 2330185, at *11 (Williams, J., concurring in part and dissenting in part).

Before this Court, the Defendant challenges only the denial of his motion to suppress. We summarize below the relevant proof adduced at the suppression hearing and the trial.[2]

On August 3, 2013, Investigators Michael Green and Brent Chunn, narcotics investigators for the Tipton County Sheriff's Office, went to a residence on Beaver Creek Lane in Tipton County after receiving information regarding a pseudoephedrine purchase at a Kroger by Mariah Davis. They also received information from an informant named Kyle Wolfe regarding an individual named Cody Gatlin, who was in a relationship with Ms. Davis. Investigator Green was familiar with Mr. Gatlin "through [his] law enforcement career."

At this residence, the investigators spoke with Ms. Davis, Mr. Gatlin, and John Harkness.[3] The investigators first spoke with Ms. Davis and questioned her about her pseudoephedrine purchase. Initially, she told the investigators that she had taken the medicine to her grandmother's house in Mason. The investigators then asked if Mr. Gatlin was home. While Mr. Gatlin was not initially present, he eventually walked over from the Defendant's residence next door, about forty to fifty feet away. During this time, Investigator Green observed the Defendant, over at his residence, looking "out [his] screen door over to where [they] were."

When the investigators asked Mr. Gatlin about the pseudoephedrine purchase, he replied that he had taken the pills next door to the Defendant, who was in the process of using them to make methamphetamine. At that point, the investigators backed down Mr. Harkness' driveway and drove thirty to forty feet to the Defendant's driveway next door. The investigators then drove down the Defendant's driveway and parked near the Defendant's trailer home.

Investigator Green described the Defendant's driveway as being gravel and approximately sixty to seventy yards long, with a sign near the roadway that said "no spraying." He did not recall, however, seeing a "No Trespassing" sign. Investigator Chunn did not recall seeing any posted signs when they entered the Defendant's property. Because it was summertime, the grass was very tall. Investigator Green estimated that the grass "would come up probably to my chin, and I'm six three."

---

[2] Because the Court of Criminal Appeals also evaluated the sufficiency of the evidence underlying the Defendant's firearms convictions, that court's opinion contains a more detailed summary of the proof adduced at trial. See Christensen, 2015 WL 2330185, at *1-4.

[3] Mr. Harkness, the owner of the residence and Mr. Gatlin's father, was deceased by the time of the suppression hearing.

As the officers walked up to the Defendant's front porch, the Defendant, holding a cane, opened the door and walked out to meet them. As soon as the Defendant opened the door, both investigators smelled an overwhelming odor associated with the manufacture of methamphetamine, even though the Defendant was several feet from the investigators at the time. Investigator Green explained that the smell differed from methamphetamine in its finished product state, in that

> [w]hen the chemical reaction is actually taking place, your smells are louder, you know. And at the finished product you've basically just got a powder there that maybe if you open a bag you'll get a hit [sic] of starter fluid or something, but nothing like it is when it's being manufactured.

From his training with methamphetamine, Investigator Green knew that methamphetamine labs were "very volatile," in that they could catch on fire quickly.

As the investigators explained to the Defendant why they were there, the Defendant denied any illegal activity. The investigators asked for consent to enter the residence because the Defendant initially seemed cooperative, and, according to Investigator Green, he "would much rather have consent than . . . just have to kick a door in." When the Defendant denied consent, however, the investigators decided to enter the trailer "[d]ue to . . . exigent circumstances." According to Investigator Green, there was no time to obtain a search warrant because

> Methamphetamine is basically, it's starter fluid, ammonium nitrate. It's a bomb in a bottle. It builds up pressure in a bottle. If you're not there to release that pressure, it's going to blow out, blow up, whatever you want to call it. So exigent circumstances, it's I don't have time to go get a search warrant. I've got to get in that house and make it safe right now. If I wait, it's going to blow up on us.

Investigator Chunn forced open the locked front door to the residence and entered to "make sure no one else was inside," while Investigator Green attempted to detain the Defendant. Investigator Green and the Defendant engaged in a struggle, and Investigator Chunn, after "clear[ing] the residence," stepped back outside to assist in apprehending the Defendant. While Investigator Green struggled to handcuff the Defendant, the Defendant called for "Bear," which Investigator Green later learned was a dog. The Defendant also screamed for his mother, who was in the other trailer on the property, to call 1-800-THE-FIRM.[4]

---

[4] As the Court of Criminal Appeals noted, "1-800-THE-FIRM is the number for the Cochran Firm, established by the late Johnnie Cochran." Christensen, 2015 WL 2330185, at *1.

-4-

Investigator Green confirmed that the Defendant probably told him at some point to get off his property but stated that it was after Investigator Green attempted to detain him. Investigator Chunn recalled that, when they arrived on the Defendant's property, the Defendant asked the officers some type of question as to why they were there, but he did not recall the Defendant telling them to get off his property at that point.

At approximately the same time they had detained the Defendant, the patrol deputies arrived, and Investigator Green had the Defendant sit down and provided him some water. At that time, the Defendant said, "It's in the freezer. It's in the freezer." Investigator Green then yelled to Investigator Chunn, who was inside the residence with the other officers, that the lab was located in the freezer. Investigator Chunn brought the active lab outside, and at some point, the officers had to relieve pressure in the bottle.

Upon entering the Defendant's residence, Investigator Green found the house to be "very unkept." Additionally, he observed the following:

> When I entered I noticed there was a bolt action 410 pistol right at the door, a 410 shotgun and a rifle on the couch. . . . And there was – Investigator Chunn had located the active meth lab and took it out, and then we saw remnants of, you know, older cooks, several cans of empty Coleman fuel, and then we located the ten separate one-pot labs in the freezer.

Investigator Green clarified at trial that the pistol at the door actually was a 410 shotgun that had been sawed off. The sawed-off shotgun was loaded with two or three rounds. The other 410 shotgun had a laser on the barrel. Investigator Green believed the Defendant "intended to go armed" even though the guns were inside the locked residence.

Investigator Chunn confirmed that the active methamphetamine lab was found in the refrigerator freezer. He noted that it was uncommon to find an active lab in the freezer but that the Defendant told them later in a statement that he placed the lab in the freezer "to stop the reaction process so he would be able to restart the lab at a later date or sometime later." Investigator Chunn estimated that it takes approximately one to four hours to manufacture methamphetamine using the "shake and bake" method. He could not say, however, how close the active lab was to completing the manufacturing process when they found it at the Defendant's residence.

The officers found ten "already cooked off" labs located in a deep freezer inside the residence. The officers also found:

one pound of drain opener or lye; a 32-ounce bottle of drain opener liquid; four empty Coleman cans; one-half gallon of Coleman; two jars with Coleman fuel; . . . eight [hydrochloric acid] generators; a bag of live trash; a bag of Epsom salt; and the empty box of pseudoephedrine, the box itself that had just been purchased.

Investigator Chunn identified a picture of the bathtub in the master bathroom, which contained "a bag of dog food with empty, numerous empty bottles that were previous methamphetamine labs."

The officers wanted to leave the Defendant's residence as quickly as possible because of its condition. They requested a methamphetamine task force clean-up truck, which arrived at the scene and "dismantled [the active lab] and took away all the hazardous materials." Investigator Chunn confirmed that the Defendant's residence was quarantined, meaning that it was considered unsuitable for habitation given that it had been contaminated with methamphetamine.

Tammy Atkins testified that she knew the Defendant through her church. She regularly traveled through the local neighborhoods "witnessing" and kept a journal of her experiences. On July 13, 2013, Ms. Atkins was on Beaver Creek Road but was not supposed to go on properties with "No Trespassing" signs. She observed that the Defendant's property had several "No Trespassing" signs posted, despite the high grass. Ms. Atkins identified several of the Defendant's "No Trespassing" and "Private Property" signs in photographs that were admitted into evidence.

The Defendant testified that he now lived in his mother's residence, which is on the same property and next door to the residence where he was living on August 3, 2013. The Defendant identified a photograph of a "No Trespassing" sign which he stated was at the beginning of the driveway onto the property, and this photograph was admitted into evidence. The Defendant stated that the property was posted with four or five such signs.

The Defendant testified that, when he looked outside and saw the officers at Mr. Gatlin's father's residence, he shut and locked his front door and "exited out the back door, walked around and stood on the front porch." He explained that he locked his front door from the inside, so when he was standing on the front porch, he had no immediate access to get inside the front door.

The Defendant testified that the following occurred when the officers arrived on his property:

> Well, I saw them get out of the vehicle and come walking up to me. And I asked them, Could I help you? I don't know if you've noticed this or not, but you passed "no trespassing" signs to get here. If you don't have a search warrant, you need to leave my property. What you're doing is unconstitutional.

The officers asked for permission to enter his residence, which he denied and told them to leave the property. At that time, Investigator Green told the Defendant that he was going to detain the Defendant. The Defendant placed his arms out but asked that he not be handcuffed behind his back because of his left arm being dislocated and broken so many times. According to the Defendant, Investigator Chunn said, "oh we're breaking your arm. We're handcuffing you behind your back." When the Defendant resisted, "[t]hey started punching [him] and kicking [him] and choking [him]." He denied that he "freaked out" during the struggle due to being under the influence of methamphetamine. Rather, he asserted that he was scared of the pain the officers were going to inflict by breaking his arm.

A video recording made by the "dash cam" of one of the reporting patrol cars was admitted into evidence and established that the Defendant's driveway was not blocked by any gates or other physical obstructions.

At the conclusion of the proof at trial, the jury deliberated and convicted the Defendant of all charged offenses. The trial court subsequently sentenced the Defendant to an effective sentence of three years' incarceration, followed by eight years suspended to supervised probation. On direct appeal, the Defendant argued that the trial court erred in denying his motion to suppress and that there was insufficient evidence to support his firearms convictions. The Court of Criminal Appeals affirmed the Defendant's convictions and sentences. Christensen, 2015 WL 2330185, at *11. Judge John Everett Williams filed a separate opinion, concluding that, by posting "No Trespassing" signs, the Defendant had revoked any implied consent for the officers to enter his property without a warrant. Id. at *11 (Williams, J., concurring in part and dissenting in part). We subsequently granted the Defendant's application for permission to appeal on the suppression issue. In our Order granting the application, we noted our particular interest in "(1) the effect, if any, of the 'unlicensed physical intrusion' definition of a search as articulated in Florida v. Jardines, 133 S. Ct. 1409 (2013); and (2) if the officers' entry into the curtilage of [the Defendant's] home constituted a search, whether it was supported by probable cause and the existence of exigent circumstances."

## Standard of Review

In evaluating whether the trial court's ruling on a suppression motion was correct, we consider the proof adduced at both the suppression hearing and at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Questions regarding the witnesses' credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, we will uphold the trial court's factual findings unless the preponderance of the evidence is otherwise. Id. However, where the trial court has applied the law to the facts, we will conduct a de novo review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

## Analysis

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions [by] government[al] officials.'" State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)).

Likewise, Article I, section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures" and that general warrants lacking particularity or evidentiary support "ought not to be granted." Tenn. Const. art. I, § 7. This Court has stated that the Tennessee Constitution's search and seizure provision is "identical in intent and purpose with the Fourth Amendment." Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968); see also, e.g., State v. Scarborough, 201 S.W.3d 607, 622 (Tenn. 2006). Accordingly, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Yeargan, 958 S.W.2d at 629.

*Jardines*

The issue before us is whether Investigators Green and Chunn engaged in an unconstitutional intrusion onto the Defendant's property when they drove down the Defendant's unobstructed driveway near which were posted "No Trespassing" signs. This is an issue of first impression before this Court.

The text of both the Fourth Amendment and Article I, section 7 refers to "houses." Therefore, when a police officer obtains information by physically intruding into someone's house, "a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 565 U.S. 400, 406 n.3 (2012)) (internal quotation marks omitted); see also Lester v. State, 393 S.W.2d 288, 289-90 (Tenn. 1965) (stating that a search within the meaning of the Tennessee Constitution occurs when the police examine "a man's home . . . with a view to the discovery of . . . some evidence of guilt"). Additionally, the curtilage, or the area immediately surrounding and associated with a particular house, also is protected by our constitutions. See Jardines, 133 S. Ct. at 1414-15; State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (stating that Article 1, section 7 of the Tennessee Constitution "protect[s] the curtilage, which is defined as any area adjacent to a residence in which an individual can reasonably expect privacy"); State v. Prier, 725 S.W.2d 667, 671 (Tenn. 1987) ("To make explicit what is unmistakably implicit in our cases and the federal cases, the curtilage is entitled to the same constitutional protection against ground entry and seizure as the home.").

There is no bright-line rule delineating the inclusion or exclusion of a given driveway within a house's curtilage for Fourth Amendment purposes. See Vanessa Rownaghi, Comment, Driving Into Unreasonableness: The Driveway, The Curtilage, and Reasonable Expectations of Privacy, 11 Am. U. J. Gender Soc. Pol'y & L. 1165, 1165-67 (2003). Because the inclusion of the Defendant's driveway within the curtilage of the Defendant's residence does not impact our resolution of the issues before us, we will assume, without deciding, that the driveway was part of the curtilage.[5]

Although a home's curtilage is constitutionally protected against unreasonable searches by the government, not every entry upon a curtilage is a search. Rather, as the Supreme Court in Jardines recently explained,

_____

[5] Property outside of a residence's curtilage is considered "open fields," and a resident is not entitled to Fourth Amendment protections as to evidence collected from open fields. See Oliver v. United States, 466 U.S. 170, 181 (1984) (holding that "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers").

-9-

> "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Breard v. Alexandria, 341 U.S. 622, 626 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. . . . Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." Kentucky v. King, 563 U.S. 452, 469 (2011).

Jardines, 133 S. Ct. at 1415-16 (parallel citations omitted). As expressed by the United States Court of Appeals for the Ninth Circuit more than fifty years ago,

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof–whether the questioner be a pollster, a salesman, or an officer of the law.

Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)[6]; see also, e.g., Nieminski v. State, 60 So. 3d 521, 526 (Fla. Dist. Ct. App. 2011) (noting that "a citizen's encounter, including a knock and talk, is not regarded as a search or seizure" but is, rather, "a purely consensual encounter, which officers may initiate without any objective level of suspicion") (citations and internal quotation marks omitted).

Our Court of Criminal Appeals has recognized that a so-called "knock-and-talk" by police officers is not prohibited by either the federal or state constitutions. See, e.g., State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) (holding that a police officer may approach the front door of a house in order to investigate a complaint or to conduct other official business because "[a] sidewalk or pathway leading from a public street to the front door of a residence represents an 'implied invitation' to the public to use a pathway" and recognizing that "[p]olice officers, who are conducting official police business, are considered members of the general public") (citing State v. Harris, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995)). In short,

---

[6] Prior to Jardines, the United States Court of Appeals for the Ninth Circuit recognized that the "honest intent" language of Davis was somewhat problematic in light of the United States Supreme Court's "rejection of good faith, subjective intent tests to gauge Fourth Amendment violations." United States v. Perea-Rey, 680 F.3d 1179, 1187 (9th Cir. 2012).

[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 563 U.S. 452, 469-70 (2011). Indeed, "even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." Id. at 470.

Thus, a so-called "knock-and-talk" is not a "search" as that term is understood within the context of the Fourth Amendment, at least if the intrusion is conducted within the scope of the implicit license recognized by the Supreme Court in Jardines. Rather, only if an officer's conduct in approaching a front door "objectively reveals a purpose to conduct a search," such as by bringing a drug-sniffing dog onto the front porch, will his approach offend the Fourth Amendment. Jardines, 133 S. Ct. at 1417-18; see also People v. Frederick, 886 N.W.2d 1, 9 (Mich. Ct. App. 2015) (stating that, under Jardines, officers "do not violate the Fourth Amendment by approaching a home and seeking to speak with its occupant. . . . However, if police enter a protected area not intending to speak with the occupant, but rather, solely to conduct a search, the line has been crossed"). Indeed, the United States Court of Appeals for the Tenth Circuit has noted that its sister courts in the Fourth and Eleventh Circuits have upheld knock-and-talk encounters after Jardines and that "[t]here does not appear to be any circuit that has concluded, after Jardines, that a knock-and-talk is invalid." United States v. Carloss, 818 F.3d 988, 994 n.4 (10th Cir. 2016) (citing Covey v. Assessor of Ohio Cnty., 777 F.3d 186, 192-93 (4th Cir. 2015); United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015)); see also, e.g., Smith v. City of Wyoming, 821 F.3d 697, 713 (6th Cir. 2016) (holding that, post-Jardines, a knock-and-talk is generally permissible); Frederick, 886 N.W.2d at 7-8 (stating that, "as Jardines makes clear, an ordinary knock-and-talk is well within the scope of the license that may be implied from the habits of the country" and that "even post-Jardines, an officer may conduct a knock-and-talk with the intent to gain the occupant's consent to a search or to otherwise acquire information from the occupant. That an officer intends to obtain information from the occupant does not transform a knock-and-talk into an unconstitutional search") (internal quotation marks omitted).[7]

---

[7] The dissent asserts that "[o]ur homes and adjoining land are protected spaces; governmental officers must have a warrant, absent special circumstances, to intrude onto this private area." As the foregoing discussion makes clear, however, officers need neither a warrant nor any special circumstances to approach a home's front door in order to conduct a knock-and-talk.

Given the Supreme Court's recognition that "the knocker on the front door is treated as an *invitation or license* to attempt an entry," Jardines, 133 S. Ct. at 1415 (emphasis added) (quotation marks omitted), it is axiomatic that a homeowner may take actions to *revoke* or otherwise limit that invitation or license. As elucidated by the United States District Court for the Middle District of Florida,

> [T]he license granted to enter property to knock on a person's door is not unlimited. Rather, it extends unless and until the homeowner provides "express orders" to the contrary. In determining the scope of the implied license, and therefore whether a police officer's approach to the front door was permissible under the Fourth Amendment, courts ask whether a reasonable person could do as the police did. Factors that may aid in the analysis include the appearance of the property, whether entry might cause a resident alarm, what ordinary visitors would be expected to do, and what a reasonably respectful citizen would be expected to do.

United States v. Holmes, 143 F. Supp. 3d 1252, 1259 (M.D. Fla. 2015) (citations and footnote omitted); see also State v. Grice, 767 S.E.2d 312, 319 (N.C. 2015) (stating that "[t]he implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners"). The "express orders" sufficient to revoke the implied license "must be by 'clear demonstrations,' 'unambiguous,' and 'obvious to the casual visitor.'" Holmes, 143 F. Supp. 3d at 1262 (citing Grice, 767 S.E.2d at 319; State v. Howard, 315 P.3d 854, 860 (Idaho Ct. App. 2013); Christensen, 2015 WL 2330185, at *8).

The question before us in this case is whether posting "No Trespassing" signs near an unobstructed driveway is an express order sufficient to revoke or limit the invitation/license such that a police officer may not legitimately approach the residence via the driveway in order to conduct a warrantless knock-and-talk encounter. That is, did the Defendant's signs turn the investigators' entry onto his property into an intrusion subject to constitutional protections? It is the Defendant's burden of establishing, by a preponderance of the evidence, that the investigators' knock-and-talk was invalid. See Holmes, 143 F. Supp. 3d at 1261.[8]

---

[8] While it is the State's burden to establish an exception to the warrant requirement when it engages in a warrantless *search*, see State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008); Vale v. Louisiana, 399 U.S. 30, 34 (1970), a knock-and-talk is simply a consensual encounter, not a search. Accordingly, it falls on the defendant to demonstrate, initially, that a knock-and-talk was, instead, a warrantless search.

-12-

The impact of "No Trespassing" signs on the validity of a knock-and-talk excursion onto a resident's curtilage has been the subject of numerous decisions by both federal and state courts and, as with much search and seizure jurisprudence, the analyses and results have varied. A few states have concluded that "No Trespassing" signs establish a legitimate expectation of privacy that renders a knock-and-talk invalid. See, e.g., State v. Roubique, 421 So. 2d 859, 862 (La. 1982) (holding that "Private Road, No Trespassing" sign at driveway's entrance was "ample evidence of [the defendant's] intent to preserve his privacy" and that officer's entry onto the defendant's property violated the Fourth Amendment); State v. Bullock, 901 P.2d 61, 75-76 (Mont. 1995) (holding that, under the Montana Constitution, "No Trespassing" signs to either side of gate across driveway gave the defendant a reasonable expectation of privacy that officer violated by entering property without a warrant); People v. Scott, 593 N.E.2d 1328, 1338 (N.Y. 1992) (holding that, under the New York Constitution, officers' warrantless entry onto land posted with "No Trespassing" signs was illegal); State v. Roper, 294 P.3d 517, 520 (Or. Ct. App. 2012) (upholding grant of motion to suppress under the Oregon Constitution because defendant's "No Trespassing" signs manifested his intent to exclude the public from his fenced yard, notwithstanding open gate); see also Robinson v. Commonwealth, 639 S.E.2d 217, 222 (Va. 2007) (stating that "[i]mplied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons"). Indeed, our Court of Criminal Appeals has indicated that "No Trespassing" signs may render a knock-and-talk invalid. See State v. Blackwell, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010) ("Clearly, the presence of the 'No Trespassing' sign evinced an actual subjective expectation of privacy and a revocation of the 'implied invitation' of the front door."); see also State v. Draper, No. E2011-01047-CCA-R3-CD, 2012 WL 1895869, at *6 (Tenn. Crim. App. May 24, 2012) (stating, "the presence of a 'no trespassing' sign 'evince[s] an actual subjective expectation of privacy and a revocation of the implied invitation of the front door") (quoting Blackwell, 2010 WL 454864, at *7); State v. Henry, No. W2005-02890-CCA-R3-CD, 2007 WL 1094146, at *5 (Tenn. Crim. App. Apr. 11, 2007) (noting in dictum that the only way in which the knock-and-talk would have been "unacceptable would have been the presence of the 'No Trespassing' signs").

Most jurisdictions that have considered the issue, however, appear to hold that "No Trespassing" signs, in and of themselves, will not invalidate a knock-and-talk. See, e.g., United States v. Bearden, 780 F.3d 887, 892-94 (8th Cir. 2015) (upholding knock-and-talk where officers entered property through open driveway gate despite "No Trespassing" signs); United States v. Hopper, 58 Fed. Appx. 619, 623 (6th Cir. 2003) (holding that knock-and-talk was allowed despite several "No Trespassing" signs near driveway); Holmes, 143 F. Supp. 3d at 1265 (holding that, "in the absence of another

-13-

barrier (such as a fence and gate), 'No Trespassing' signs do not, in and of themselves, withdraw the implied consent to conduct a knock and talk"); Davis v. City of Milwaukee, No. 13-CV-982-JPS, 2015 WL 5010459, at *13) (E.D. Wis. Aug. 21, 2015) (stating that "signs stating 'Private Property' or 'No Trespassing' do not, by themselves, create an impenetrable privacy zone"); United States v. Jones, No. 4:13CR00011-003, 2013 WL 4678229, at *2 n.2, *6, *9 (W.D. Va. Aug. 30, 2013) (holding that multiple signs along driveway and on property stating "No Trespassing," "Posted: Private Property," and "Keep Out" did not invalidate knock-and-talk under the Fourth Amendment); United States v. Denim, No. 2:13-CR-63, 2013 WL 4591469, at *4 (E.D. Tenn. Aug. 28, 2013) (stating, post-Jardines, that, "[e]ven in the face of No Trespassing signs, it is not unreasonable for a police officer to intrude upon private property to ask if the resident has any information that will aid in the investigation of a crime"); United States v. Schultz, No. 13-20023, 2013 WL 2352742, at *5 (E.D. Mich. May 29, 2013) (holding that knock-and-talk entry via driveway was valid under the Fourth Amendment despite "No Trespassing" signs); Michel v. State, 961 P.2d 436, 437-38 (Alaska Ct. App. 1998) (holding that four "No Trespassing" signs along three-hundred-yard driveway did not invalidate knock-and-talk); Burdyshaw v. State, 10 S.W.3d 918, 921 (Ark. Ct. App. 2000) (holding that officers' entry onto property via driveway did not violate the Fourth Amendment in spite of "No Trespassing" signs posted on property); State v. Rigoulot, 846 P.2d 918, 923 (Idaho Ct. App. 1992) (stating that "No Trespassing" signs cannot "reasonably be interpreted to exclude normal, legitimate inquiries" and holding that officers did not violate the Fourth Amendment despite the presence of "No Trespassing" signs); Jones v. State, 943 A.2d 1, 12 (Md. Ct. Spec. App. 2008) (holding that "No Trespassing" sign did not preclude knock-and-talk by police and noting that "courts have been very consistent in concluding that no trespassing signs, in and of themselves, do not make a police officer's entry on property unlawful"); City of Beatrice v. Meints, 856 N.W.2d 410, 421 (Neb. 2014) (holding that a resident "could not reasonably expect that tacking a 'no trespassing' sign to a tree would prevent others from viewing or walking on his land"), cert. denied __ U.S. __, 135 S. Ct. 2388 (2015); State v. Smith, 783 S.E.2d 504, 509-10 (N.C. Ct. App. 2016) (holding that "No Trespassing" sign did not revoke the implied license to approach the defendant's home, therefore knock-and-talk did not violate the Fourth Amendment); State v. Mittleider, 809 N.W.2d 303, 307-08 (N.D. 2011) (holding that "No Trespassing" signs posted around the defendant's farmstead "did not create a reasonable expectation of privacy in the entrance of the farmstead"); State v. Morgan, No. 13-CA-30, 2014 WL 1836015, at *6 (Ohio Ct. App. May 1, 2014) (stating that "[t]he presence of 'no trespassing' signs does not make law enforcement's encroachment onto the curtilage presumptively unreasonable when officers are otherwise lawfully present"). As stated by the Idaho Court of Appeals,

[while] posting "No Trespassing" signs may indicate a desire to restrict unwanted visitors and announce one's expectations of privacy[,] . . . such signs cannot reasonably be interpreted to exclude normal, legitimate inquiries or visits by mail carriers, newspaper deliverers, census takers, neighbors, friends, utility workers and others who restrict their movements to the areas of one's property normally used to approach the home.

Rigoulot, 846 P.2d at 923. Indeed, the dissent recognizes that, even for those jurisdictions that may find "No Trespassing" signs to be sufficient in and of themselves to revoke the implied license to approach the front door, such signs "must be appropriately worded and placed." In our view, this analytical approach is inadequate to provide our police officers with sufficient guidance in their efforts to act within constitutional parameters.

Recently, the United States Court of Appeals for the Tenth Circuit considered a case in which two police officers knocked on the defendant's front door in spite of several "No Trespassing" signs posted around the house and on the house's front door. United States v. Carloss, 818 F.3d 988, 990 (10th Cir. 2016), cert. denied, 137 S. Ct. 231 (2016). The case generated a lead opinion, a concurring opinion, and a dissent. The lead opinion stated that "just the presence of a 'No Trespassing' sign is not alone sufficient to convey to an objective officer, or member of the public, that he cannot go to the front door and knock," id. at 995, and held that the sign on the front door, which stated "Posted Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose is Strictly Forbidden Violators Will Be Prosecuted," was "ambiguous and did not clearly revoke the implied license extended to members of the public, including police officers, to enter the home's curtilage and knock on the front door, seeking to speak consensually with the occupants," id. at 996. "Therefore, the officers did not violate the Fourth Amendment when they went onto the porch and knocked on the front door of the house in which [the defendant] lived." Id. at 997.

The separate concurring opinion advocated that the court "deploy an objective test, asking whether a reasonable person would conclude that entry onto the curtilage–the front porch here–by police or others was *categorically* barred." Id. at 999 (Tymkovich, C.J., concurring). The Chief Judge elaborated:

The signs in this case of course communicated variants of the phrase "No Trespassing." But in light of the strong social presumption that a visitor to a residential neighborhood can enter the front porch curtilage to knock, I doubt a reasonable, lawful visitor would believe that "No Trespassing" eliminated that presumption in every instance. Every

-15-

reasonable person knows–even without seeing a "No Trespassing" sign–that one cannot trespass on private property. But that knowledge coexists with knowledge of the equally well-established principle that one may generally enter the curtilage to knock. A reasonable observer could also understand a "No Trespassing" sign as restating the "no-trespassing" principle without thinking it had any bearing on the implicit license to enter the curtilage for social reasons. In a residential context, the intention of the homeowner who posts signs, without more, seems inadequate to revoke the license. See, e.g., State v. Hiebert, 156 Idaho 637, 329 P.3d 1085, 1090 (App. 2014) (noting that "where a 'no trespassing' sign is ambiguous and not clearly posted, the implied invitation to enter the curtilage of a home via the normal access routes is not revoked"). I emphasize that it is not my view that a "No Trespassing" sign will *never* indicate the revocation of the implied license. Rather, the circumstances of this case do not indicate a revocation occurred such that the police could not reasonably believe entry was permissible.

. . . .

Of course, the right facts could remove that ambiguity. For example, a "No Trespassing" sign posted on a fence encircling a property imparts a different message than the same sign standing alone. And a closed or locked gate, especially in the residential context, imparts more information to the reasonable observer. See, e.g., State v. Christensen, 131 Idaho 143, 953 P.2d 583, 587-88 (1998) (holding that "No Trespassing" sign "clearly posted on a gate across the only public access to the property" revoked the implicit license because "the message to the public was [not] ambiguous"). But nothing aside from their numerosity makes the "No Trespassing" signs in this case particularly distinctive. And numerosity alone does not eliminate the ambiguity I noted above. No special facts–like a fence or other physical obstacle–clarified to the reasonable visitor that these signs revoked the license.

Id. at 999-1000 (Tymkovich, C.J., concurring) (footnote omitted). The concurring opinion stressed the frequent axiom of Fourth Amendment jurisprudence: "The result turns on the totality of the circumstances." Id. at 1001 (Tymkovich, C.J., concurring). We agree with Chief Judge Tymkovich's approach:[9] under the totality of the

---

[9] We emphasize that this approach recognizes the possibility that a sign, under the right circumstances, *could* be sufficient to revoke the implied license. Accordingly, we also emphasize that we are not adopting a per se rule in this case. Nor, as the dissent contends, are we adopting a rule that

-16-

circumstances, would an objectively reasonable person conclude that entry onto the Defendant's driveway was categorically barred?

The United States Supreme Court stated long ago that "[t]he law of trespass recognizes the interest in possession and control of one's property and for that reason permits exclusion of unwanted intruders. *But it does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the Fourth Amendment*." Oliver v. United States, 466 U.S. 170, 183 n.15 (1984) (emphasis added). "Thus, trespass laws are designed to keep out unwanted intruders, such as vandals, thieves, and squatters, but those laws do not implicate the privacy interests in 'persons, houses, papers, and effects' protected by the Fourth Amendment." Holmes, 143 F. Supp. 3d at 1264 (citing Oliver, 466 U.S. at 176). Therefore,

> [t]o find that a "No Trespassing" sign on its own expressly revokes the implied consent to walk up to a front door and knock, [we] would have to find that the sign means something like, "Do not do those things that would normally be considered trespassing, and also, I now consider anyone walking up to my front door to be a trespasser as well."

Id. at 1264-65.

We agree with the overwhelming majority of jurisdictions that have addressed the issue that signs admonishing "No Trespassing," in and of themselves, are rarely going to be sufficient to revoke the implied license allowing persons to approach a front door and knock. The term "No Trespassing" is not so clear and unambiguous as the Defendant and the dissent claim. See Carloss, 818 F.3d at 995 (stating that no trespassing signs "by themselves, do not have the talismanic quality [the defendant] attributes to them"). Black's Law Dictionary defines the term "trespass" as "[a]n *unlawful* act committed against the person or property of another; especially, *wrongful* entry on another's real property." Black's Law Dictionary 1503 (10th ed. 2014) (emphases added). This definition implies clearly that some entries onto another's real property are neither unlawful nor wrongful and, therefore, are not trespasses. Indeed, this Court recognized over one hundred and fifty years ago that, "[i]n law every entry upon the soil of another, *in the absence of a lawful authority, without the owner's license*, is a trespass." Norvell

differentiates between persons based upon their economic resources. This case presents the issue of whether "No Trespassing" signs posted near a private driveway are sufficient, *in and of themselves*, to create a constitutional barrier to police officers attempting to conduct legitimate police business via the resource of a consensual encounter with the occupant of the private residence. Nothing about this narrow issue reasonably implies that only wealthy homeowners can insulate themselves from law enforcement incursions onto their curtilage.

-17-

v. Gray's Lessee, 31 Tenn. 96, 103 (1851) (emphasis added); see also, e.g., City of Townsend v. Danico, No. E2013-01778-COA-R3-CV, 2014 WL 2194453, at *3 (Tenn. Ct. App. 2014) (recognizing that "[t]he courts of this state have . . . defined the tort of trespass as an unauthorized entry upon the land of another") (citing Norvell, 31 Tenn. at 103); Holmes, 143 F. Supp. 3d at 1265 (stating that "the plain meaning of 'No Trespassing' is that it prohibits what people ordinarily think of as trespassing, and does not alter the character of an entry that one would not otherwise think to be a trespass, such as the implied license to approach the homeowner's door to knock and talk") (citing Oliver, 466 U.S. at 183 n.15).

In short, a homeowner who posts a "No Trespassing" sign is simply making explicit what the law already recognizes: that persons entering onto another person's land must have a legitimate reason for doing so or risk being held civilly, or perhaps even criminally, liable for trespass. Consequently, as set forth above, a knock-and-talk conducted within constitutional parameters is a legitimate reason for police officers to enter the curtilage of a house via a driveway that is obstructed by nothing more than several "No Trespassing" signs. For this reason, we disagree with the dissent that "a 'No Trespassing' sign should be of particular significance to law enforcement officers in communicating that they may need to obtain a warrant before entering the property."[10] Officers engaging in legitimate police business will conclude, correctly, that they are not engaging in a "trespass" when they approach a front door to conduct a knock-and-talk. We also emphasize that the occupant of a residence is under no obligation to open a door when knocked upon by a police officer who holds no warrant.

The Defendant asserts that his signs were accompanied by other barriers to entry, including overgrown vegetation, the lack of a pathway to his house, and debris blocking any possible route from the driveway to the front porch, and that the totality of these circumstances made clear that no one was to enter his property absent an express invitation. We are not persuaded. First, the impact of signs at the beginning of a long driveway is not altered by the eventual accessibility of the front porch sixty or seventy yards later. Second, while a fence and a closed gate that physically block access to the front door of a house, in some instances, may be sufficient to revoke the implied license to enter the curtilage of a residence,[11] mere ambiguous signage and unkemptness are not.

---

[10] The dissent's approach of allowing a simple "No Trespassing" sign to prohibit a legitimate knock-and-talk by law enforcement also would create even more problematic consequences in more densely populated areas of our state.

[11] See, e.g., State v. Koenig, 148 A.3d 977, 984 (Vt. 2016) (stating that "[f]ences, gates *and* no-trespassing signs generally suffice to apprise a person that the area is private") (emphasis added); Burkholder v. Superior Court, 96 Cal. App. 3d 421, 428 (Cal. Ct. App. 1979) (holding that agents' entry onto defendant's property violated the Fourth Amendment because "[e]ntry to the property was openly

We agree with the lead opinion below that the Defendant's signs "would not have prevented the casual visitor or the reasonably respectful citizen from approaching [the Defendant's] residence." Christensen, 2015 WL 2330185, at *8. Accordingly, we hold that, under the totality of the circumstances, the Defendant's "No Trespassing" signs posted near his unobstructed driveway were not sufficient to revoke the implied license referred to in Jardines. The Defendant is not entitled to relief on this basis.

*Reasonable Expectation of Privacy*

Jardines dealt with two officers who entered the defendant's curtilage with a drug-sniffing dog which proceeded to sniff and, therefore, to search. 133 S. Ct. at 1416. Because the search was not supported by a warrant or any of the recognized exceptions to the warrant requirement, the Supreme Court held that the search was unconstitutional. See id. at 1417. The Supreme Court based its decision on "the traditional property-based understanding of the Fourth Amendment," rather than on the "reasonable expectation of privacy" test set forth in Katz v. United States, 389 U.S. 347 (1967). Id. See Holmes, 143 F. Supp. 3d at 1257 (noting that the determination of whether an intrusion was a search under the Fourth Amendment "'originally was tied to common-law trespass and involved some trespassory intrusion on property'" but that the United States Supreme Court subsequently "'added a separate test–the reasonable-expectation-of-privacy test–to analyze whether a search occurred for purposes of the Fourth Amendment'") (quoting United States v. Davis, 785 F.3d 498, 506, 507 (11th Cir. 2015)).

Unlike the Supreme Court in Jardines, we have concluded that the facts of this case do not indicate that a search in violation of the Fourth Amendment occurred under the property-based analysis used in Jardines when Investigators Green and Chunn drove up to the Defendant's residence. Because the Supreme Court in Jardines indicated that "[t]he Katz reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment," 133 S. Ct. at 1417 (quoting Jones, 565 U.S. at 409), we now apply the reasonable-expectations test to the facts of this case. That is also the test we utilize under the Tennessee Constitution. See Talley, 307 S.W.3d at 730.

---

restricted by posted signs along, and locked gates across, the rural access road signifying an intention to deny access to the public in general, including government agents"); Brown v. State, 152 So.3d 619, 624 (Fla. Dist. Ct. App. 2014) (holding that agents' knock-and-talk excursion onto the defendant's curtilage offended the Fourth Amendment because the defendant's curtilage was surrounded by two gated fences posted with no trespassing signs); State v. Johnson, 879 P.2d 984, 992 (Wash. Ct. App. 1994) (agents violated Washington Constitution by entering property that defendant had fenced, gated, and posted with no trespassing and private property signs).

Under the reasonable-expectations test, a warrantless intrusion by government agents onto a homeowner's real property does not violate either the federal or state constitution unless the intrusion violates the homeowner's "reasonable expectation of privacy." See Katz, 389 U.S. at 361 (Harlan, J., concurring); Talley, 307 S.W.3d at 730. Initially, it is the homeowner's burden to establish that he had a "reasonable expectation of privacy" against the intrusion. Talley, 307 S.W.3d at 730. The homeowner must satisfy two prongs: (1) that he had "an actual, subjective expectation of privacy," and (2) that "society is willing to view [his] subjective expectation of privacy as reasonable and justifiable under the circumstances." Id. (quoting State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)). We examine the totality of the circumstances in determining the reasonableness of a claimed expectation of privacy. Id. at 734.

As he contended in his argument regarding the Jardines property-based test, the Defendant argues that his "No Trespassing" signs established that he had a reasonable expectation of privacy that precluded any entry onto his curtilage by Investigators Green and Chunn. We disagree. For the same reasons supporting our holding under the Jardines test, we hold that the Defendant has failed to satisfy the second prong of the reasonable expectations test. See Jardines, 133 S. Ct. at 1419 (noting that, "[i]t is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions" (Kagan, J., concurring) (quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))). Even if the Defendant had an actual, subjective expectation that his signs would keep all persons from entering his property under all circumstances, a reasonable member of society would not view that expectation as reasonable and justifiable. Rather, a reasonable member of society would view the Defendant's "No Trespassing" signs as simply forbidding any unauthorized or illegitimate entry onto his property.

In short, the Defendant has failed to demonstrate that he had a *reasonable* expectation that ordinary citizens would not occasionally enter his property by walking or driving up his driveway and approaching his front door to talk with him "for all of the many reasons that people knock on front doors." Nieminski v. State, 60 So.3d 521, 528 (Fla. Dist. Ct. App. 2011). Therefore, Investigators Green and Chunn did not violate the Defendant's federal or state constitutional rights against unreasonable searches when they drove up his driveway and approached his front door. The Defendant is not entitled to relief on this basis.

Because we have determined that the officers' initial entry onto the Defendant's property did not violate either the federal or Tennessee constitutions, we need not

determine whether the entry was supported by probable cause and the existence of exigent circumstances.[12]

## **Conclusion**

We hold that Investigators Green and Chunn did not violate either the federal or Tennessee constitutional prohibitions against unreasonable searches when they drove down the Defendant's unobstructed driveway past "No Trespassing" signs and approached his residence in order to conduct a knock-and-talk consensual encounter. The Defendant was not entitled to the suppression of evidence on this basis. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

---

[12] The issue of Investigator Chunn's forcible entry into the Defendant's home is not before us. Indeed, during oral arguments before this Court, defense counsel acknowledged that Investigator Chunn's entry into the residence after smelling the odor associated with the active manufacture of methamphetamine was supported by exigent circumstances and probable cause. See United States v. Brown, 449 F.3d 741, 745 (6th Cir. 2006) (recognizing that, "[t]o justify a warrantless entry based on exigent circumstances, there must also be probable cause to enter the residence").