IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 6, 2018 Session

## STATE OF TENNESSEE v. WILLIAM ZACHARY WEATHERLY

**Appeal from the Circuit Court for Dyer County**
**No. 16-CR-265      R. Lee Moore, Jr., Judge**

_____

### No. W2017-01014-CCA-R3-CD

_____

In this appeal, we address the constitutionality of police officers' search of trash located within the curtilage of the home of the Defendant, Williams Zachary Weatherly. The police officers utilized evidence obtained from the Defendant's trash to secure a search warrant for the Defendant's home and vehicle. As a result of evidence seized from the Defendant's trash and during the execution of the search warrant, the Defendant was charged with possession with the intent to sell or deliver more than one-half ounce of marijuana and possession of a firearm during the commission of a dangerous felony. The Defendant filed a motion to suppress. Following a hearing, the trial court granted the motion, finding that the warrantless search of the Defendant's trash was unconstitutional and that the search warrant failed to establish probable cause. The State appealed. Upon reviewing the record and the applicable law, we affirm the trial court's granting of the motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellant, State of Tennessee.

Nathan B. Pride and Angela Hopson, Jackson, Tennessee, for the appellee, William Zachary Weatherly.

**OPINION**

# FACTUAL AND PROCEDURAL HISTORY

On December 9, 2015, officers with the Dyersburg Police Department obtained and executed a search warrant of the Defendant's vehicle and home on Keats Street in Dyersburg, Tennessee. The affidavit in support of the search warrant was prepared by Officer Chris Pursell and provided as follows:

1. I am an officer with the Dyersburg Police Department where I have been employed for over seventeen years. Since October of 2013, I have been assigned to a specialized unit that investigates a variety of criminal cases[,] including the sale and distribution of illegal narcotics. I have been involved in numerous narcotic[-]related cases that have led to both misdemeanor and felony arrests and convictions. I have participated in the execution of numerous search warrants.

The affidavit continues with approximately five pages of Officer Pursell's knowledge regarding the general practices and activities of drug traffickers. The affidavit also provides:

3. On December 1, 2015, affiant was contacted by Captain Billy Williams of the Dyersburg Police Department in reference to drug activity being conducted by Matthew Pinson at Matthew's residence…. A complaint had been made to the Tennessee Department of Children's Services that Matthew Pinson was using and distributing marijuana and prescription pills at his residence…. During an investigation into Pinson[,] it was revealed that Pinson's drug supplier was possibly William Zachary Weatherly. This [led] your affiant to do a "trash pull" in order to gather corroborating evidence on this information.

Your affiant checked with the City of Dyersburg Public Works Department, John Damesworth[,] who indicated that Tuesday was a regularly scheduled trash pickup for Keats St. Damesworth indicated that trash is regularly picked up on Keats St. on Tuesday between the hours of 9 and 10 [a.m.]. On Tuesday, December 8, 2015[,] at approximately 08:40 am, your affiant and Officer Thayer did recover 4 bags of trash from the South and East sides of the residence…. These bags were then brought to a separate location for further inspection. The following w[ere] located in the bags: One bag consisted of discarded mail addressed to the names Millie Johnson, Millie Johnson Weatherly, William Weatherly, and Zach Weatherly at [the residence on] Keats St. One opened plastic vacuum seal bag labeled "AF Goo 2" which had a strong odor that would be associated

with Marijuana emanating from it. Inside the bag was a small amount of green leafy substance which appears to be Marijuana. Research into the term "AF Goo" revealed that AF Goo, otherwise referred to as "AF Gooey[,]" refers to a strain of Marijuana. A small amount of plant material believed to be Marijuana stems and an empty box of plastic sandwich bags were also located inside this same trash bag.

4. According to the City of Dyersburg records[,] the gas and water utilities for [the residence] Keats St[.] are in the name of Millie Johnson Weatherly and William Z[.] Weatherly. The last payment made on the account was on 10/23/15.

5. William Zachary Weatherly's criminal history shows that he pled guilty to Possession of a Schedule VI drug with intent to sell, in October of 2001 in Newbern[,] Tennessee. He received a judicial diversion for this charge.

The Defendant filed a motion to suppress evidence seized during the execution of the search warrant, arguing that the affidavit in support of the search warrant failed to establish probable cause. The Defendant challenged the information provided by the confidential informant and the constitutionality of the trash collection by the officers. The State filed a response in which it maintained that the information in the affidavit established probable cause for the issuance of the search warrant and that the Defendant did not have a reasonable expectation of privacy in the trash bags.

During the suppression hearing, Dyersburg Police Officer Chris Pursell testified that he had been a police officer for almost nineteen years and was assigned to the Street Crimes Unit, which investigated drug-related offenses. He stated that in early December 2015, Captain Williams from the Criminal Investigation Division provided officers with information that the Defendant was possibly supplying drugs to Mr. Matthew Pinson. Officer Pursell believed Captain Williams received the information from the Department of Children's Services.

Once the officers located the Defendant's residence, they decided to do a "trash pull." An officer contacted the head of trash services in the public works department and learned that trash was scheduled to be collected on the street where the Defendant lived on December 8, 2015, between 9:00 and 10:00 a.m. The officers arranged for the use of a garbage truck for the morning of December 8. At approximately 8:40 a.m., Officer Mason McDowell drove the truck down the street where the Defendant lived while Officer Pursell and Sergeant Todd Thayer, dressed as trash collectors, collected trash.

The officers placed the trash bags collected from other houses on the side of the street for the actual trash collectors to obtain later.

Officer Pursell testified that when he reached the Defendant's house, he observed the Defendant's trash beside his house and next to the kitchen door. Trash from the Defendant's neighbors was not in his yard or beside his trash. The officers collected four bags of trash from the Defendant. The officers took the Defendant's trash to the rear of their truck and kept it at a location separate from the neighbors' trash. The officers took the Defendant's trash back to their office and searched it.

Officer Pursell recalled that three of the trash bags did not contain anything of interest. He stated that the fourth bag contained several pieces of mail or documents with the name of the Defendant or his wife and a large vacuumed sealed bag that contained a strong odor of marijuana and green leafy residue that appeared to be marijuana. The bag was labeled "AFGOO2," which Officer Pursell stated was, based on his research, a strand of high-grade marijuana. He also stated that the vacuumed sealed bag looked like it could hold up to one pound of marijuana. Officers also located marijuana stems and an empty box of sandwich bags in the trash bag. Officer Pursell explained that sandwich bags are often used by drug dealers to package small amounts of drugs, especially high grade drugs, for resale. Although Officer Pursell researched the Defendant's criminal history, he could not recall whether the Defendant had any prior criminal convictions.

Officer Pursell drafted an affidavit and obtained a search warrant on December 9, and officers executed the search warrant on the same day. The officers knocked on the front door and broke down the door when no one answered. The Defendant was standing in the hallway and partially inside a bathroom doorway. The officers announced why they were there, ordered the Defendant to the ground, and took him into custody. The Defendant's wife also was present. The officers located a Charter Arms .38 caliber revolver, which Officer Pursell believed was loaded, inside the bathroom. The officers located three sandwich bags containing a total of seventy grams of marijuana, a small plastic bowl containing marijuana residue, and a set of digital scales in a dresser in the master bedroom. They found another sandwich bag containing fifteen grams of marijuana between the dresser and the wall. In a second bedroom, they located an unloaded Remington 870 shotgun, a loaded Rock Island .45 caliber handgun, and two boxes of shotgun shells. In a third bedroom, officers found a mason jar containing marijuana, a small plastic bowl with a leaf grinder containing marijuana, two glass water pipes, one small smoking pipe with marijuana residue in it, a small container which included two whole and several partial Xanax pills, four boxes of shotgun shells, one box of .45 caliber ammunition, and one box of .38 caliber ammunition. In the kitchen, officers located a prescription pill bottle containing a small amount of marijuana and a straight shooter pipe. Officers recovered a 12 gauge shotgun, a .308 rifle, two boxes of

shotgun shells, and two boxes of 308 ammunition from the Defendant's vehicle. Cash in the amount of $229 was on the Defendant's person.

On cross-examination, Officer Pursell testified that although the affidavit in support of the search warrant stated that officers collected the trash bags from the south and east sides of the Defendant's home, they collected the bags from trash cans located beside the southeast corner of the house. Officer Pursell did not know how long the trash bags were outside of the Defendant's home before the officers collected them. He acknowledged that the vacuumed sealed bag contained "[a] pinch" of marijuana residue when officers located it and that the bag did not state the amount that it had once contained.

Officer Pursell stated that the Defendant was not known to him as a drug dealer and believed this was the first time that he had investigated the Defendant. Officer Pursell acknowledged that the Defendant's prior drug offense occurred in 2001 and that he did not believe that the charge occurred in the house in which the Defendant was living in 2015. Captain Williams told Officer Pursell that he received information from a juvenile in the custody of the Department of Children's Services that Mr. Pinson was trafficking marijuana and that the juvenile had firsthand knowledge that the Defendant was supplying Mr. Pinson with marijuana. Officer Pursell acknowledged that he stated in the affidavit that the Defendant was "possibly" Mr. Pinson's supplier. Officer Pursell was unaware of the time that elapsed between Captain Williams's receipt of the information and his relaying the information to Officer Pursell. Officer Pursell stated that he believed Captain Williams relayed the information to him within one day of receiving it because "we don't usually sit on that kind of thing for a long time."

On redirect examination, Officer Pursell identified a photograph of the Defendant's house and the trash can taken when officers executed the search warrant and stated that the trash can was in the same location as it had been when officers collected the Defendant's trash bags. The photograph was taken next to the Defendant's mailbox and depicts a driveway and a walkway that led to the front door. The trash can was located off the driveway and the walkway and on the side of the house in front of a privacy fence.

Following the suppression hearing, the trial court entered an order finding that the affidavit in support of the search warrant failed to establish probable cause and granting the Defendant's motion to suppress. The trial court found that the affidavit did not include any information establishing when the officers received the information from the confidential informant, the basis of the information, or the veracity of the informant. The trial court further found that the "trash pull" was unconstitutional because it was conducted within the curtilage of the Defendant's home. The trial court subsequently

entered a consent order dismissing the Defendant's charges because the State was unable to proceed with the prosecution without the suppressed evidence. The State filed a timely notice of appeal.

## ANALYSIS

The State maintains that the trial court erred in granting the Defendant's motion to suppress because the Defendant did not have a reasonable expectation of privacy in the trash and because the search warrant affidavit established probable cause justifying the issuance of the search warrant. The trial court's findings of fact at the conclusion of a suppression hearing are binding upon this court unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The Defendant, as the prevailing party in the trial court, "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* This court's review of the trial court's application of law to the facts is de novo with no presumption of correctness. *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010).

## I. Constitutionality of the "Trash Pull"

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause…." U.S. Const. amend. IV. Article I, section 7 of the Tennessee Constitution provides that "the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures" and that general warrants that lack particularity or evidentiary support "ought not to be granted." Tenn. Const. art. I, § 7. "The purpose of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions [by] government officials.'" *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). The search and seizure provision in the Tennessee Constitution is "'identical in intent and purpose with the Fourth Amendment.'" *State v. Christensen*, 517 S.W.3d 60, 68 (Tenn. 2017) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)). Therefore, "'under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" *Id.* at 69 (quoting *Yeargan*, 958 S.W.2d at 629).

A search occurs when the government obtains information (1) by violating a person's reasonable expectation of privacy, *see Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring); *Christensen*, 517 S.W.3d 77-78; or (2) through physical invasion into a constitutionally protected area, *see Florida v. Jardines*, 569 U.S. 1, 5 (2013) (citing *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)); *Christensen*, 517 S.W.3d at 69-71.

The State argues that the Defendant did not have a reasonable expectation of privacy in the trash collected and searched by police officers. The State relies upon *California v. Greenwood*, 486 U.S. 35, 37, 39 (1988), in which the United States Supreme Court applied the reasonable expectation of privacy test and held that the Fourth Amendment did not prohibit "the warrantless search and seizure of garbage left for collection outside the curtilage of a home." The Court concluded that the defendants' exposing their trash to the public was sufficient to defeat their claim of Fourth Amendment protection and noted that "[i]t is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id.* at 40 (footnotes omitted). The Court further noted that the defendants placed their trash "at the curb for the express purpose of conveying it to a third party, the trash collector," who might have sorted through the trash or permitted others, such as the police, to do so. *Id.* The Court concluded that the defendants did not have a reasonable expectation of privacy in the inculpatory items included in the trash "having deposited their garbage in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it." *Id.* at 40-41 (quotation omitted).

Unlike the Court in *Greenwood*, the trial court in the present case found that the Defendant's trash was located within the curtilage of his home, a finding that the State does not challenge on appeal. The constitutional protection afforded to a house extends to the curtilage, which is "the area immediately surrounding and associated with a particular house." *Christensen*, 517 S.W.3d at 69 (citing *Jardines*, 569 U.S. at 6; *Talley*, 307 S.W.3d at 729; *State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987)). The reasonable expectation of privacy test relied upon by the State "does not subtract anything from the [Fourth] Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.'" *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, Jr., concurring in the judgment)) (emphasis in original).

Since the officers' investigation occurred in a constitutionally protected area, we must examine whether the "trash pull" was accomplished through "an unlicensed physical intrusion." *Id*. at 7. Not every entry upon curtilage by police officers constitutes

- 7 -

a search. *See id.* at 8; *Christensen*, 517 S.W.3d at 69. For example, "'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'" *Jardines*, 569 U.S. at 8 (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* Accordingly, a police officer may approach a home without a warrant and knock because "that is 'no more than any private citizen might do.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

However, the scope of an express or implied license to physically intrude into a constitutionally protected area is limited to both a particular area and a specific purpose. *Jardines*, 569 U.S. at 9. While a visitor typically has an implicit license to approach the front door of a home and knock, "to spot the same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Id.* Furthermore, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* Based on these principles, the United States Supreme Court held in *Jardines* that a police officer conducted an unconstitutional search when he used a drug-sniffing dog on the defendant's front porch to investigate the contents of the defendant's home. *Id.* at 3, 10.

In the present case, the police officers entered the curtilage of the Defendant's home and approached his trash can, which was located off the driveway and next to the kitchen door on the right side of the Defendant's home. The officers retrieved the trash bags from the trash can for the express purpose of searching their contents. There is no evidence that the trash can was at a location where trash collectors would have collected the trash for disposal on that day. We conclude that the police officers entered a constitutionally protected area and gathered evidence through an unlicensed physical intrusion. Accordingly, the "trash pull" was an unconstitutional, warrantless search. *See Commonwealth v. Ousley*, 393 S.W.3d 15, 33 (Ky. 2013) (holding that police officers engaged in an unconstitutional search by entering the curtilage of the defendant's home without a search warrant and removing trash bags from a trash container).

We need not decide whether the officers' investigation violated the Defendant's reasonable expectation of privacy. "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Jardines*, 569 U.S. at 11. The fact that "the officers learned what they learned only by physically intruding on [the Defendant's] property to gather evidence is enough to establish that a search occurred." *Id.*

## II. Validity of the Search Warrant

We next consider whether the search warrant established probable cause independent of the evidence discovered during the unconstitutional search of the Defendant's trash. Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). However, "[p]ursuant to the independent source doctrine, an unlawful entry does not mandate the suppression of evidence located inside a residence if the evidence is subsequently discovered following the execution of a valid warrant based upon facts independent and separate from information discovered as a result of the unlawful entry." *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005); *see State v. Clark*, 833 S.W.2d 597, 600 (Tenn. 1992). "[E]vidence seized pursuant to an unreasonable search and seizure cannot be used to establish probable cause for the issuance of a search warrant." *State v. Vanderford*, 980 S.W.2d 390, 399 (Tenn. Crim. App. 1997).

Under both the United States and Tennessee Constitutions, no search warrant may be issued except upon probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998). When the information regarding the unconstitutional "trash pull" is redacted from the search warrant, the only information that remains is the officer's generalized knowledge regarding drug trafficking, a statement that a complaint was made to the Tennessee Department of Children's Services that Mr. Pinson was using and distributing marijuana and prescription pills at his residence, a statement that an investigation revealed that the Defendant was "possibly" Mr. Pinson's drug supplier, and a statement that the Defendant pleaded guilty in 2001 to possession with the intent to sell a Schedule VI controlled substance.

The information in a search warrant need not be admissible in a criminal trial and need not reflect the direct personal observations of the affiant. *State v. Tuttle*, 515 S.W.3d 282, 301 (Tenn. 2017). Information from a law enforcement officer or a citizen informant is presumed to be reliable if the affidavit identifies the source of the information as a police officer or a citizen informant. *Id.* A presumption of reliability does not attach to information provided by "an unknown informant or an informant from the 'criminal milieu.'" *Id.* (citations omitted).

At the time of the suppression hearing in the present case, a supporting affidavit that included information supplied by an unknown informant or a criminal informant was required to show (1) the informant's basis of knowledge; and (2) the veracity of the informant or the reliability of the informant's information. *See State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989) (citing *Spinelli v. United States*, 393 U.S. 410, 415-16

(1969); *Aguilar v. Texas*, 378 U.S. 108, 114 (1964)). The Tennessee Supreme Court has since adopted the totality-of-the-circumstances test, which requires the issuing magistrate to "'make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Tuttle*, 515 S.W.3d 303-04 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal quotations omitted). Under the totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility are no longer separate and independent considerations but are "'closely intertwined issues that may usefully illuminate the commonsense, practical question [of] whether there is probable cause to believe that contraband or evidence is located in a particular place.'" *Id*. at 308 (quoting *Gates*, 462 U.S. at 230) (internal quotations omitted). Barebones affidavits including only conclusory statements remain insufficient, and independent police corroboration of the information provided by the informant continues to add value to the affidavit. *Id.* at 307-08.

In the present case, the affidavit does not include any information regarding the basis of the knowledge of the confidential informant who submitted a complaint to the Tennessee Department of Children's Services or the informant's veracity or credibility. Furthermore, the confidential informant did not implicate the Defendant in any criminal activity. The affidavit includes a conclusory statement that an investigation revealed that the Defendant was "possibly" Mr. Pinson's supplier, but there is nothing in the affidavit setting forth the details of the investigation or what the investigation specifically revealed. Furthermore, the Defendant's criminal conviction occurred more than fourteen years before the search warrant was sought. Upon considering the totality of the circumstances, we conclude that the information remaining in the affidavit after the information relating to the "trash pull" is redacted is insufficient to establish probable cause for issuance of the search warrant. Accordingly, the trial court was correct in denying the Defendant's motion to suppress.

## CONCLUSION

Upon reviewing the record and the applicable law, we uphold the trial court's order granting the Defendant's motion to suppress, and we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

- 10 -