IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2024

FILED
09/06/2024
Clerk of the
Appellate Courts

# STATE OF TENNESSEE v. CHARLES EDWARD YOUNG

**Appeal from the Circuit Court for Bedford County**
No. 19212    Forest A. Durard, Jr., Judge

———————————————————

**No. M2022-00999-CCA-R3-CD**

———————————————————

A Bedford County Jury convicted Defendant, Charles Edward Young, of: (1) especially aggravated robbery; (2) first degree murder during the perpetration of a robbery; (3) premeditated first degree murder; and (4) conspiracy to commit especially aggravated robbery. The trial court imposed an effective sentence of life plus ninety years. On appeal, Defendant argues that the trial court erred in denying Defendant's motion to suppress the evidence obtained from his cell phone; the court erred in declining to compel the State to disclose evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); and that the jury's verdicts are against the weight of the evidence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

Tammy D. Wendt, Lewisburg, Tennessee, for the appellant, Charles Edward Young.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Robert Carter, District Attorney General; Michael D. Randles and Amber Sandoval, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal stems from the March 18, 2020 robbery and bludgeoning death of Artenchis Wainwright, the victim, by Defendant and two co-defendants, Crystalia Ford and Colby Watford, in Shelbyville.[1]  Evidence at trial revealed that Ford, who was the victim's girlfriend, conspired with Defendant to steal money from the victim, and Defendant enlisted the help of Colby to do so.  On August 17, 2020, the Bedford County Grand Jury indicted Defendant on counts of (1) especially aggravated robbery; (2) first degree murder during the perpetration of an especially aggravated robbery; (3) premeditated first degree murder; and (4) conspiracy to commit especially aggravated robbery.  Ford and Colby also were charged in the indictment, but as explained later in this opinion, testified against Defendant at trial.

### A.  Pretrial Motions

Motion to Suppress iPhone Evidence.  During the investigation, officers obtained a search warrant for Defendant's iPhone, believing that it contained evidence of the victim's death.  The warrant specifically listed an "Apple [iPhone]Xs Max ESN# 353111101839544" as belonging to Defendant, with his date of birth also listed.  The first page of the affidavit in support of the warrant states, in pertinent part:

> that there is probable cause to believe that [Defendant with his date of birth] is in possession and control of certain evidence of a crime to wit: violations of state laws as set forth in [Tennessee Code Annotated] Section 39-13-201 [Criminal Homicide] and that evidence of said crimes be found within an Apple [iPhone]Xs Maxcellular phone that belongs to [Defendant with his date of birth] that is now is now in the custody and control of the Shelbyville Police Department.  The evidence to be searched is as follows:
>
> Apple [iPhone]Xs Max ESN # 353111101839544[.]
>
> This affiant requests permission to search the Apple [iPhone]Xs Max cellular phone for the following evidence: Any SMS/MMS Messages,

---

[1]  Due to Colby Watford and Donna Watford, who is referenced later in this opinion, having the same surname, we will refer to Mr. and Mrs. Watford by their first names—Donna and Colby—for clarity in this opinion.

Images, Documents, Emails, Chats and/or any Data that can be used as evidence for the violation of the offense listed above.

The affidavit continued with a statement of facts in support of probable cause linking Defendant to the victim's death, and having frequent telephone contact with Ford before and immediately after the victim was killed. The affidavit further notes that Defendant's phone traveled from Murfreesboro shortly before the crimes, was in Shelbyville at the time of the crimes, and traveled back to Murfreesboro an hour later.

Prior to trial, Defendant filed a motion to suppress all evidence officers obtained from the iPhone seized from his person because he claimed the original warrant and affidavit were improperly filed with the clerk's office, and Defendant was not served with the warrant, as required by Rule of Criminal Procedure 41. He further argued officers illegally seized the iPhone without a warrant and the warrant to search the iPhone was invalid. Specifically, he asserted:

> The Circuit Court Clerk's office in Shelbyville has no copy of this warrant and affidavit on file, and Defendant thus has cause to believe there is no surviving original copy of the search warrant and affidavit.
>
> Additionally, there is zero evidence (nay, not even a mention) of the specific cell phone, an Apple iPhone XS, in the Statement of Facts In Support of Probable Cause in the affidavit to the search warrant.
>
> All of the above grounds require exclusion of any evidence derived from the iPhone XS. Failure to comply with [Tennessee Rule of Criminal Procedure] 41 in maintaining the originals of the search warrant require suppression. A warrantless seizure is presumed unreasonable under the [Fourth] Amendment. Without some nexus in the affidavit between the criminal activity and the property to be searched, there is no probable cause.

To the contrary, the State contended that the search and seizure of the iPhone was legal, and that all data and information retrieved from the iPhone should properly be considered as evidence. The State asserted that the search warrant affidavit contained probable cause to believe that Defendant was in possession of the iPhone, and that the Shelbyville Police Department had legal grounds to search it. According to the State, it "defie[d] logic" that the search warrant would not permit seizure of the iPhone because it would be impossible to conduct a search of a phone without seizing it. The warrant stated that the officers may search for the information at issue and that they were commanded to seize it. Therefore, the proper reading of the search warrant was that

officers were permitted to search for the iPhone and seize it to retrieve the data off of it. The State also countered Defendant's argument for suppression as it related to Rule 41, arguing that the warrant itself was filed as the Rule required, and Defendant was also already in possession of the affidavit.

On February 4, 2022, the trial court conducted a hearing on Defendant's motion to suppress. The search warrant and supporting affidavit for Defendant's iPhone were exhibited to the hearing. Detective Charles Merlo of the Shelbyville Police Department testified that on March 31, 2020, he and other officers went to Murfreesboro around 1:43 p.m. with the warrant to locate Defendant, search his vehicle, and seize his phone. Upon searching Defendant, officers found two phones, the aforementioned iPhone and one Samsung.[2] Detective Merlo asked Defendant if he wished to go to Shelbyville and discuss the victim's death. Defendant agreed and was transported in an unmarked vehicle with no handcuffs. Detectives told him that they would drop him off anywhere he needed after the interview. The officers advised Defendant of his *Miranda* rights, which he waived, and Defendant provided a statement to the officers. Defendant agreed to provide officers with the code to unlock the iPhone, but then claimed could not remember it. The use of facial recognition software was also unsuccessful. Officers ultimately used the "gray key," which used a computer program to unlock the iPhone and search it pursuant to the warrant.

The trial court denied Defendant's motion to suppress the evidence from his iPhone and stated the following in its written order:

1. [A]s it relates to the requesting, providing or obtaining the search warrant and affidavit, [Defendant] has received the warrant and affidavit. . . . Why the search warrant could not be found in the clerk's office, the court has no answer. It was stamped filed April 3, 2020, by the clerk. Perhaps it was misplaced. The affidavit is not required to be filed pursuant to [Tennessee Rule of Criminal Procedure] 41 and would not [be] expected to be found in the clerk's office.

2. [Defendant] complains the affidavit does not mention the iPhone specifically. True, the affidavit does not specifically state iPhone but it contains concrete information . . . regarding [Defendant's] phone. . . . It would defy commonsense to say, when the warrant and affidavit are considered, that the phone mentioned in the affidavit was not the same phone referenced in the search warrant. The affiant only references

---

[2] Defendant consented to a search of the Samsung phone in writing without a warrant, but evidence from this phone was not used at trial.

- 4 -

one phone in the search warrant, not multiple phones, so there is no confusion as to exactly what item is sought to be searched.

3. Next, [Defendant] complains the data from the iPhone should be excluded due to the failure to comply with [Tennessee Rule of Criminal Procedure] 41 and then the seizure becomes warrantless, presumptively unreasonable and without a nexus between the criminal activity and property to be searched. The court assumes from the hearing [Defendant] is referencing the inability for the search warrant to be found in the clerk's office. . . . However, [Defendant] did obtain the search warrant by some other means so he is not prejudiced and was afforded a hearing on any issues arising from the warrant. Furthermore, if [Defendant] is complaining about the affidavit, that document does not have to be filed as mentioned already. . . . Lastly, Defendant alleges the search warrant is invalid and consequently, the search becomes an unreasonable warrantless search and seizure. The court considers this reasoning to be misplaced as will be addressed later herein.

4. Next it is alleged that no copy of the warrant was served upon [Defendant] and, thus, the data from the iPhone should be excluded. First, this issue was not pled in the motion to suppress and, while evidence was taken, the state objected to its consideration as being waived. The court agrees; however, the court will address the issue in the event it is later determined to have not been waived. . . . Defendant was informed . . . of the purpose of the seizure of the phone. Defendant cooperated and turned over the phone. . . . [Defendant] called a detective, perhaps Merlo, several days later to get his phone returned. Defendant eventually got a copy of the warrant and affidavit and was afforded a hearing on any issues. [Defendant] has suffered no prejudice.

5. Lastly, Defendant complains the warrant only directs an exam of the phone and not its seizure. This was not specifically pled but was heard and will be addressed. . . . [A] logical, commonsense reading of the instant warrant describing the evidence sought shows it is implicit in order to search the iPhone it must be seized and the warrant authorizes the same.

Motion to Compel. Defendant also moved to compel the State to disclose a statement from Colby's wife, Donna. In his motion, Defendant stated that when he was

preparing for trial, he "stumbled across the mention of a witness, Donna Watford . . . while trying to locate all the search warrants for Defendant's seized property." Defendant asserted that the State should be compelled to provide Donna's statement because it was exculpatory under *Brady*. Defendant further asked the court to suppress Donna's statement if the State sought to introduce it at trial.[3] The State responded that Donna's statement was not discoverable under Tennessee Rule of Criminal Procedure 16 and was not exculpatory under *Brady*. The State never provided Defendant with a recording or transcripts of Donna's statement.

The trial court conducted a hearing on Defendant's motion to compel on the same day it heard Defendant's motion to suppress. The search warrant affidavit that was exhibited to the motion to suppress hearing contained a summary of Donna's statements to police officers. According to the affidavit, Donna told police that in March, Colby "came home bragging about robbing a guy he knows." Colby told Donna that, after the robbery, the victim died from his injuries, so they took and "blew up" his car. Donna stated that around the time the crimes occurred, Colby lost his job and contacted Defendant looking for another construction job, as the two had been co-workers. However, rather than coming home from a construction job with Defendant, "Colby came home and obtained items to rob someone." Colby retrieved a bat, facemask, and gloves, and drove his white Chevy Colorado four-door pickup truck to Defendant's house.

Donna stated that Colby later returned home with singed hair on his arms, about a pound of marijuana, and $400 in cash. He and Defendant were both worried because Defendant lost one of the gloves at the crime scene. He cleaned and bleached the inside of his truck, and burned his seat covers, phone, shoes, and gloves. Colby cleaned the bat with bleach and left it at his father's house in a lock box. Colby told Donna that he helped Defendant tie up the victim, but Defendant was the one who assaulted him. Co-defendant Ford was the victim's girlfriend, but she served as a look-out during the crime. About thirty minutes after the incident, Ford called Defendant and Colby to let them know the victim had died.

At the hearing, the trial court noted that it had received a disk with an hour-long recording of Donna's interview from the State for an in-camera review. The court had not reviewed the recording at the time of the hearing, but it subsequently issued a written order indicating it had reviewed and considered the disk. In its written order denying Defendant's motion to compel, the trial court stated:

> It is evident the information in the affidavit came from the interview. . . .
> The interview and the information contained the same information.

_____

[3] Donna was not called as a witness at trial by the State or Defendant.

- 6 -

However, there are some relatively minor inconsistencies from the Colby Watford interview in Exhibit 2 and what Donna Watford states her husband told her. These same inconsistencies are contained in the affidavit supplied by the Defendant and attached to his motion. Thus, Defendant already has this information. Furthermore, these inconsistencies are not exculpatory to this Defendant. . . . [T]he motion to compel pretrial discovery of the interview of Donna Watford is hereby denied for the reasons stated above.

Defendant's counsel asked the trial court about preserving the disk in the record; specifically, he asked whether the items had been "marked and sealed" for appellate purposes. The court responded that the disk was marked as a sealed exhibit and asked Defendant's counsel whether that process met counsel's "expectations," to which counsel agreed.

## B. Trial Proceedings

The State's evidence at trial showed that on March 18, 2020, Shelbyville police responded to the victim's home after a reported home invasion and possible robbery or aggravated assault. Officers arrived to see Ford standing outside of the house near the front door and the victim lying on his stomach in the doorway. The victim had two severe lacerations on the top of his head and was bleeding with a large amount of blood surrounding him. The victim was still alive at that time but was unable to communicate with officers and only said, "My head, my head." After about forty-five minutes, paramedics consulted with doctors and pronounced the victim dead on the scene.

While at the crime scene, officers found blood throughout the home. One officer recovered a cloth and rubber glove with blood on it in the front yard just outside the house. Officers noticed that Ford was standing over the glove and appeared to be attempting to conceal it. There were also bloody shoeprints throughout the house. In the den, officers located a locking container that looked like a book but contained marijuana, smoking paraphernalia, a pocketknife, and a small amount of cash. They also found several hundred grams of marijuana in various containers throughout the den, and they found an empty plastic handgun case.

Officers obtained video evidence during their investigation. The victim's Infiniti car could be seen on security camera footage heading north toward Rutherford County being followed by Colby's white Chevrolet Colorado truck. After the victim was robbed and killed, the Infiniti was found a short time later completely burned in Rutherford County. Another video showed Ford's white Charger leaving the victim's residence as Colby's white truck pulled in, and the Charger later returning. None of the videos were clear enough to identify the occupants of the vehicles.

Doctor Randy Tashjian was the forensic pathologist and medical examiner who performed the victim's autopsy. According to the doctor, the victim suffered a significant number of lacerations, fractures, and hemorrhaging all over his body. The medical examiner testified that he had never seen an injury section as long as the one on the victim's body. Notably, there was a two-inch long skull fracture that was determined to be caused by multiple blunt force strikes to the victim's head. These strikes were consistent with the back of a gun or a baseball bat, and the doctor said they ultimately caused the victim's death.

Testing showed that blood from around the house and on the glove found in the yard was the victim's. Ford's clothing also came back positive for the victim's blood and the bloody footprints matched Ford's tread. Defendant was excluded as a contributor of any of the blood tested from the house. Investigators also went to Colby's home and collected ashes from a fire pit they found, but everything in the fire pit was too badly burned to hold any evidentiary value.

Investigators discovered numerous calls between Ford and Defendant's cell iPhone on the day of the victim's death, some within minutes of when officers estimated that the crimes occurred. Officers served Defendant with search warrants for his vehicle and phone on March 31, 2020. Defendant agreed to give a voluntary interview. During the interview, Defendant denied being in Shelbyville on the night of the victim's death. He claimed that night he was with Charlotte Mason, who was saved in his phone contacts as "Roomy." Defendant told police that he did not know the victim, but that he did know Ford because he and Ford had been romantically involved for about a year and a half. Defendant admitted he spoke with Ford on the day of the victim's death. In fact, an audio recording from a room equipped with recording capability at the police department revealed Ford called Defendant while she was waiting to speak to officers that night. Ford told Defendant the victim was dead and there was a BOLO on his vehicle. Ford blocked Defendant's number from her phone minutes after that call.

The investigation revealed that calls and messages had been deleted from Defendant's iPhone, and the extracted data from the iPhone was missing some calls and messages that appeared on the provider's records. The provider's records showed Defendant and Ford shared two phone calls between 9:14 p.m. and 9:16 p.m. on the night of the murder, and tower location data showed that Defendant's phone was near the crime scene during these calls. The provider's records also showed several calls between the co-defendants in the hours leading up to the murder and just after they left the scene. They also showed Defendant made calls to Ms. Mason that evening. Ten days after the victim's death, officers observed Ford and Defendant together in Defendant's car at a Sonic restaurant.

Ford testified for the State. She said that she was living with the victim in March of 2020 and considered him to be her boyfriend even though she was going through a divorce from another man at the time. She testified that the victim sold drugs, mostly marijuana, as his source of income. According to Ford, she spent time with Defendant occasionally when the victim was seeing another woman. The victim was not always aware of when Ford was seeing Defendant.

Ford testified that before the victim's death, she sold property and gave the victim $30,000 of the proceeds so that he could pay off a marijuana purchase. She expected the victim to repay her within a month. However, after a few weeks, she asked for her money back, but the victim did not pay her. She reached out to Defendant, who said that he could get the money back from the victim.

On the afternoon of March 18, 2020, Ford met with Defendant. They made the following plan: Defendant would arrange to meet the victim at 8:00 p.m. at a Kroger in Shelbyville to conduct a drug deal while Ford shopped inside. Then Defendant planned to go to the victim's and Ford's home while Ford remained at Kroger. Ford did not know Defendant's exact plans at the home, but they discussed that the victim would not give up the money willingly and Ford believed the victim would fight.

Ford then met with the victim and accompanied him on several drug deliveries before returning home. Upon arriving there, the victim followed Ford through the back door that led into a den. As Ford walked in, she noticed her dog was not there. Also, a gun, which was usually on the coffee table or one of the end tables, was missing. Seconds later, two men walked in from the kitchen with one pointing a gun and the other wielding a baseball bat at the victim and Ford. Ford said the victim kept a bat behind their front door. The men were dressed in all black with only their eyes visible, but Ford stated one man was white and one was black. Ford recognized the black man as Defendant from his body shape, eyes, and voice. She did not recognize the white man. The white man said, "Where it at, bitch?" The white man was holding the bat, and Defendant was holding the gun.

Ford said she screamed and ran into a closet—she said she was afraid even though she knew it was Defendant. She said that this was not what they had planned. She could not see anything, but she heard "groaning and . . . fighting, not talking." At some point she thought she heard Defendant say, "Let's go. The police are on the way." She called her daughter while in the closet and stayed there for what "[f]elt like forever." When asked why she called her daughter instead of 911, Ford stated there were "so many drugs in our house." She finally left the closet when she heard the door chime.

- 9 -

Ford testified that when she emerged from the closet, she saw blood everywhere but did not see anyone else. She said she ran through the living room, the den and ran "outside. . . . hollering [the victim's] name." When Ford ran outside, the victim's Infiniti car was missing and the two attackers were gone. She called one of the victim's friends whom the victim had said to call if they had "any problems" and told the friend "We need help." After reentering the home, Ford found the victim moaning in the hallway behind a closet door. The victim's ankles were bound with duct tape and he said he was thirsty, so she got him a drink of water. She said he had a "place" on his head, but "it wasn't bleeding bad." The victim asked her to cut the tape off his ankles. She cut the tape off and gave him water, but he could not swallow. She then called 911. She tried to walk him to the front door so she could take him to the hospital, but he collapsed. The last thing he said was "I love you." She stated that she held him for fifteen or twenty minutes until some neighbors, one of whom was an Emergency Medical Technician, came and began CPR on the victim. The police arrived and Ford stood in the yard and paced back and forth. Defendant called her on her phone and said, "he had dropped a glove and [she] needed her to look for it." This was the same glove police found that Ford was trying to hide. She admitted meeting Defendant at Sonic and meeting him approximately ten times after the victim's death. Ford said she was hoping to get "less time" by testifying.

On cross-examination, Ford agreed she had failed to identify Defendant as the victim's killer in four statements to the police. She stated: "I didn't tell them anything about who killed [the victim]." She acknowledged that she had initially told officers she thought other people who had robbed the victim of $7,000 on a prior occasion were responsible for his death. She admitted accompanying the victim on drug deliveries and that drugs were stored in her and the victim's home. Ford agreed she stood to benefit if Defendant had successfully collected the $30,000 from the victim but stated that Defendant was the "mastermind" of the plan to obtain the money. When asked to describe her relationship with Defendant, Ford said, "On and off we had sex, that was it."

Colby also testified for the State. He said that he had recently lost his job around March 18, 2020. Colby contacted Defendant for a lead on a job and Defendant talked about the $30,000 he and Ford were planning to steal from the victim. Defendant offered to split it equally three ways if Colby would help him carry out the robbery. According to Colby, Defendant "already had it [set up]. . . . And all we had to do was go inside the house and wait for them to get home, question and interrogate the man about where the money would be." Defendant did not tell Colby how he knew the victim or Ford, just that "the girl was in on it and we could trust her." Defendant drove a black Lincoln and met Colby at a drug store. Defendant wanted to take Colby's white Chevy Colorado to the robbery because Defendant's car had GPS tracking on it. After discussing their plan, Colby and Defendant rode together in Colby's truck. Defendant gave Colby directions to the victim's home in Shelbyville. Defendant brought a black duffel bag with ski masks

and duct tape and showed the bag's contents to Colby as they drove. Defendant also had a gas can and told Colby that they may need to pour gas over the victim if he refused to give up the money. Defendant planned to use the duct tape so the victim could not move. Colby had his own gloves but said Defendant wore mismatched gloves, the same ones Defendant got from work.

Colby said when they arrived at the home, he saw a gray "sports car" in the driveway. At Defendant's direction, Colby dropped Defendant off with the duffel bag and Colby parked the truck at a nearby apartment complex. After Colby walked back to the home, Defendant and Colby entered through the home's back door, which Defendant told him would be unlocked. The home was "empty," but Defendant handed Colby a ski mask and told him to "put it on and get ready." Defendant stuffed a PlayStation into the duffel bag and they began searching for the money. Colby started "ransacking the house, trying to open the cabinet doors, flip over mattresses, look at coffee tables . . . to try and find the money stashed somewhere." They did not find it, but they did find "a big bag of vacuum[-]sealed marijuana" that they placed in the duffel bag. Colby said he "didn't have any idea there was going to be drugs there at all." Defendant found a metal baseball bat "at the front door" and gave it to Colby. Defendant then showed Colby that he was carrying a handgun "in his hoodie jacket pocket in the front." Colby said he did not know Defendant was armed prior to seeing the handgun.

Colby testified that for thirty to forty-five minutes they waited inside the home's front closet "that had a window you could look outside into the front driveway." Defendant saw a vehicle pull into the driveway and told Colby they "needed to get out of the closet and [into] the kitchen to wait for them to come through the door." They did so, and when the victim and Ford entered the home, the victim tackled and pinned Colby while Ford "screamed and ran past" them. Defendant hit the victim in the back of the head "two or three times" with the back of his gun. Colby said, "Blood started coming out of [the victim's] head immediately." The victim "got dazed a little bit but was still trying to fight" Colby. Defendant then grabbed the bat from Colby and hit the victim at least ten times while the victim was "on top of" Colby. Colby stated that the victim "blacked out and lost consciousness." While Colby could not see the victim, he knew "[h]e was bleeding really bad" because he "could smell it." Colby pushed the victim off of him, and the victim awoke about thirty seconds to a minute later. After the victim came to, "[t]hat is when the questioning began." Defendant and Colby repeatedly asked the victim where the money was while Defendant resumed striking the victim with the bat. Defendant told the victim "I'll kill you if I have to." The victim said the only money he had was in his pocket, and Colby retrieved $1,000 and the victim's car keys from the victim's pocket, which he gave to Defendant. Defendant and Colby eventually laid the victim in the shower, and Defendant directed Colby to bind the victim's wrists and ankles with duct tape that Defendant had brought with him to the robbery. When asked about

the $30,000, the victim told the men that the money must be gone because he spent it. Colby and Defendant then decided to leave the house because they believed the victim "was going to die pretty soon."

Colby said that, upon leaving the house, Defendant wanted to take the victim's car so that "he could try to get some money out of [it]." Therefore, Defendant "got in the driver's seat and [Colby] got in the passenger seat." From there, Defendant drove Colby to get his truck, and Colby followed Defendant "wherever he wanted to go." Colby further testified that as they left the house, Defendant took the duffel bag and Colby took the bat.

The two later reconvened to split the money and other stolen items between them. Colby received $400 and five ounces of marijuana. According to Colby, Defendant then decided they needed to "get rid of the [victim's] car . . . to burn it." They drove to a secluded area, where Defendant "grab[bed] the gasoline out of the duffel bag and pour[ed] it all over the car, inside and outside." Defendant then set the car on fire. After that night, Defendant called Colby "multiple times, the next days all the way up to [Colby's] arrest," instructing Colby to burn his truck, destroy his phone, and get rid of the bat and the clothing from the night of the murder. Colby burned his phone and threw the metal remains into a creek. He washed out his truck with bleach, put the bat in a recycling bin, and took his clothes to the dump.

One of Defendant's cellmates, Lee Warren, also testified at trial. Regarding his discussions with Defendant about the victim's death, Warren stated:

> [Defendant] told me that [there] was another white guy involved and that [there] was a female involved that was a doctor. He said he was in a relationship with the female, but that she had a husband. And he told me that the husband . . . he told me he died, but he wasn't supposed to.
>
> . . . .
>
> [Defendant] would say that it couldn't be proved that he had anything to do with the man dying. So I was like, well, how did this even come about? And this is what he told me. He said the white guy owed him some money. He kept BS'ing with him every time he called him and asked him for his money that he wouldn't – he would try to throw him off. So to help him pay him, he decided to help him by giving him a lick as they – as they, as the phrase that's being used as a come-up, said the guy was supposed to have about . . . $30,000 and a couple pounds of marijuana.

- 12 -

. . . .

> Many times when we had this discussion, I would ask [Defendant] about the female . . . . And he told me that they were trying to find a way to be together . . . for her to get rid of him without divorcing him.

Defendant did not testify or present any evidence. The jury convicted Defendant as charged on all four counts. The trial court sentenced Defendant to a total effective sentence of life plus ninety years imprisonment.[4] Appellant subsequently filed a motion for a new trial, which the trial court denied on June 20, 2022. Appellant filed a notice of appeal in this court on July 21, 2022, thirty-one days later.

## II. LAW AND ANALYSIS

As an initial matter, we note that Defendant's notice of appeal was untimely filed. A notice of appeal is required to be filed "within 30 days after the date of entry of the judgment appealed from[.]" Tenn. R. App. P. 4(c). An appellant who files a late notice of appeal risks having their entire appeal dismissed. *See State v. Manning*, 2023 WL 7439203 at *6 (Tenn. Crim. App. Nov. 9, 2023). However, the Rule allows that the timeliness requirement "may be waived in the interest of justice." Tenn. R. App. P. 4(a). We note that the notice of appeal was only one day late, and we acknowledge the magnitude of Defendant's convictions. Thus, in the interest of justice, we waive the untimely filed notice of appeal.

On appeal, Defendant argues: 1) the trial court erred in denying Defendant's motion to suppress the evidence obtained from his iPhone; 2) the trial court erred in determining the State did not violate *Brady* when it did not disclose Donna's statement; and 3) there was insufficient evidence to sustain Defendant's convictions.[5]

### A. Motion to Suppress iPhone Evidence

Defendant argues that the trial court erred in denying his motion to suppress the evidence obtained from his iPhone. While Defendant's brief contains one general section on this issue, he appears to assert that the motion should have been granted for multiple reasons, including the following: (1) there was no nexus in the affidavit between the criminal activity and the property to be searched and, therefore, no probable cause; (2) the warrant to search the iPhone does not mention seizing the phone, only searching it;

---

[4] Defendant does not raise any sentencing issues in this appeal.
[5] We have renumbered Defendant's arguments for clarity in this opinion.

- 13 -

(3) the State failed to prove Defendant was served a copy of the search warrant; and (4) court officials failed to maintain the originals of the search warrant.

Defendant argues that there was no nexus in the affidavit in support of the search warrant between the criminal activity and the property to be searched. Thus, he claims, no probable cause existed to issue the search warrant. As authority for his argument, Defendant cites the due process clause of the Fourteenth Amendment to the United States Constitution. We assume, as does the State in its brief, that Defendant's argument incorporates the Fourth Amendment to the United States Constitution. The Fourth Amendment is made applicable to the states by virtue of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643 (1961).

"The Fourth Amendment to the United States Constitution provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . .'" *State v. Christensen*, 517 S.W.3d 60, 68 (Tenn. 2017) (quoting U.S. Const. amend. IV). Searches and seizures conducted pursuant to valid warrants are presumptively reasonable. *State v. McCormick*, 494 S.W.3d 678, 678-79 (Tenn. 2016) (internal quotation marks omitted) (citing *State v. Scarborough*, 201 S.W.3d 607, 616-17 (Tenn. 2006)).

"An appellate court considering whether probable cause supported the issuance of a search warrant 'may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant.'" *State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017) (quoting *State v. Henning*, 975 S.W.2d, 298 (Tenn. 1998)). Probable cause to issue a warrant is established by presenting a sworn and written affidavit to the magistrate that contains more than conclusory allegations—it must include facts by which the independent magistrate can determine whether probable cause exists. *See id.* at 300.

"Articulating precisely what probable cause means is not possible. Probable cause is more than a mere suspicion but less than absolute certainty. [T]he strength of the evidence necessary to establish probable cause ... is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." *Id.* at 299-300 (internal citations and quotation marks omitted). When an affidavit is proffered to show probable cause for a search warrant, "it must 'set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched.'" *Id.* at 300 (quoting *State v. Smith*, 868 S.W.2d 561, 562 (Tenn. 1993). Thus, to prove probable cause exists, "the affidavit presented to the magistrate must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Id.*

Upon our review of the affidavit, it states that officers were aware that Ford was likely more involved in the crimes than she first admitted. Officers examined Ford's cell phone and found Defendant's number listed as "Chris" in her contacts. Ford admitted that Chris was Defendant's nickname. Officers found fifty-two calls between Ford and Defendant's iPhone in the week before the victim's death. Seventeen of these calls occurred shortly before the death, including one that took place within minutes of the 911 call. Four additional calls occurred between the phones immediately after the victim died. Ford admitted she was cheating on the victim with Defendant, and messages from her phone indicated that the victim was upset about it. Finally, the location of Defendant's iPhone, which was in Murfreesboro hours before the crime, was near the location of the crime scene at the time of the victim's death. We conclude there was sufficient evidence on the face of the affidavit to demonstrate a nexus between the crimes and Defendant's iPhone, and that probable cause existed that evidence of the crime would be found on the phone.

Defendant also asserts that while the warrant allowed officers to search the content of the iPhone, it did not permit seizure of the iPhone. He further states that the affidavit in support of the warrant "does not even mention the phone itself." This is clearly refuted by the record, and a cursory review of the affidavit quickly disposes of this issue. The introductory portion of the affidavit specifically lists an "Apple [iPhone]Xs Max ESN# 353111101839544 as belonging to Defendant, with his date of birth also listed. As the trial court correctly recognized in its order denying Defendant's motion to suppress, it is clear from other portions of the affidavit that the probable cause section refers to that specific iPhone. And as the State correctly points out in its brief, seizure of the iPhone is specifically directed in the search warrant. The warrant states that Detective Cody Smith is "commanded to search for the aforesaid evidence; and if you find the same or any part thereof, *you shall seize the evidence*." This issue is without merit.

Addressing Defendant's remaining two grounds for suppressing the contents of the iPhone—that officers failed to serve Defendant with a copy of the search warrant, and officials failed to maintain the originals of the search warrant—these issues are waived, as we explain in the following sections.

## B. Waiver of Remaining Issues

The Court of Criminal Appeals is an error-correcting court. *State v. Cunningham*, No. M2023-00909-CCA-R3-CD, 2024 WL 3634259, at *2 (Tenn. Crim. App. Aug. 2, 2024) (citing *State v. Phifer*, No. M2013-01401-CCA-R3-CD, 2014 WL 4698499, at *16 (Tenn. Crim. App. Sept. 23, 2013), *no perm. app. filed*). "[O]ur role is not to 'sit as self-directed boards of legal inquiry and research, sallying forth each day looking for wrongs to right.'" *Id*. (quoting *State v. Bristol*, 654 S.W.3d 917, 924 (Tenn. 2022)). Incumbent

on the parties is a duty to both identify errors "*they* believe they were committed in the trial court and to show why *they* believe the law entitles them to relief on appeal." *Id.* (emphasis in original) (citing *Berry v. State*, 366 S.W.3d 160, 269 (Tenn. Crim. App. 2011)).

Accordingly, appellate review is generally limited to issues that are preserved for review in the trial court, included in the motion for a new trial after a jury verdict, or presented as an issue on appeal. *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). "[S]imply raising an issue is not sufficient to preserve it for review." *State v. Gooch*, No. M2022-01395-CCA-R3-CD, 2024 WL 2814624, at *4 n.4 (Tenn. Crim. App. June 3, 2024), *perm. app. open*. As we have stated previously, "we caution counsel, [ ] that appellate review is frustrated by the failure to include facts relevant to the issues on appeal and the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected." *State v. Lynch*, No. E2019-00195-CCA-R3-CD, 2020 WL 1899611, at *3 (Tenn. Crim. App. Apr 17, 2020).

Rule 27(a)(7)(A) of the Tennessee Rules of Appellate Procedure requires an appellant to support issues raised on appeal with "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Pursuant to Rule 10(b) of this court, issues raised by an appellant that "are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived." Tenn. Ct. Crim. App. R. 10(b).

Recently, this court opined:

Where there is failure to provide this Court with an adequate appellate record and failure to prepare a sufficient brief in compliance with the Rules of Appellate Procedure, the issue is waived. *State v. Lucy Killebrew*, 760 S.W.2d 228, 236 (Tenn. Crim. App. 1988) (waived issue where Defendant had failed to adequately brief issues by making appropriate references to the record, cite authority in support of issues, and/or make appropriate arguments); *see also State v. Jason Steven Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL 17245128, at *2 (Tenn. Crim. App. Nov. 28, 2022) *no. perm app. yet filed* (waived issues where Defendant had failed to provide an adequate appellate record and had not prepared a sufficient brief); *see also State v. Sheila Marie Lott*, No. M2008-02127-CCA-R3-CD, 2010 WL 565664, at *4 (Tenn. Crim. App. Feb. 18, 2010) ("Appellant also makes a cursory statement that her sentences should have been run concurrently rather than consecutively. Appellant includes no argument or citations to authority to support the statement. [ ] Because Appellant has

failed to cite any authority for this claim, it is waived."); *see also Dwight Seaton v. State*, No. E1999-01312-CCA-R3-CD, 2000 WL 1177462, at *3 (Tenn. Crim. App. Aug 21, 2000) (waived issue where appellate brief contained no citations to appropriate authorities in support of argument).

*State v. Moss*, No. M2021-00043-CCA-R3-CD, 2023 WL 1117795, at *1 (Tenn. Crim. App. Jan. 31, 2023). "[I]n the absence of an adequate record, this court must presume the trial court's ruling was correct." *State v. Worthington*, No. W2018-01040-CCA-R3-CD, 2019 WL 2067926, at *6 (Tenn. Crim. App. May, 8 2019) (citing *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. Sept. 15, 1993)). We cannot conduct a proper review without a complete record. *State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993).

Rule 41(e)(4). Defendant asserts that the officers who seized Defendant's iPhone did not comply with Tenn. R. Crim. P. 41(e)(4), in that the State failed to prove officers left a copy of the search warrant with Defendant. Thus, according to Defendant, the search is illegal, and the evidence obtained from the iPhone should have been suppressed. As the State recognizes in its brief, however, Defendant failed to properly make this argument to the trial court. In its order denying Defendant's motion to suppress, the trial court determined that Defendant waived this argument because Defendant failed to plead it in his written motion: "[I]t is alleged no copy of the warrant was served upon [Defendant] and, thus, the data from the iPhone should be excluded. First, this issue was not pled in the motion to suppress and, while evidence was taken, the [S]tate objected to its consideration as being waived. The court agrees."[6] So do we. Because Defendant did not challenge the trial court's finding of waiver on appeal, this issue is waived. *See* Tenn. R. App. P. 27; Tenn R. App. P. 36; Tenn. Ct. Crim. App. R. 10(b).

Defendant also argues that court officials failed to "maintain the originals of the search warrant," thus making the search illegal. In response, the State argues that this issue has been waived because Defendant offered no authority for this contention in his brief. Our review of Defendant's brief shows only one partial sentence attributed to his claim, and no authority cited in support. We agree with the State that Defendant's brief does not contain the legal or factual support required for the court to consider this issue. *See* Tenn. R. App. P. 27(a)(7)(A).

Defendant's *Brady* Claim. Defendant next asserts that the trial court erred in denying his motion to compel the State to disclose Donna's statement to police because it was in violation of *Brady*. The State argues that Defendant waived his *Brady* challenge by failing to include in the record on appeal a copy of the recording of Donna's interview, which was relied on by the trial court. We agree.

---

[6] The trial court did, however, proceed to address the merits in its ruling on this issue.

In its order denying Defendant's motion to compel, the trial court noted that it had reviewed a recording of the statement given by Donna to the police in May of 2020, and referred to "Exhibit 1 [disk] attached supplied by the [S]tate." The court noted that it "reviewed in camera the police interview of Donna Watford." However, in the appellate record there is no disk or recording of Donna's interview with police that we can review. As such, we must presume the trial court's ruling was correct because we cannot conduct a proper review without a complete record. *See Worthington*, 2019 WL 2067926, at *6; *see also Ballard*, 855 S.W.2d at 561.

We acknowledge that, at trial, Defendant was assured that the disk had been "marked and sealed" for appellate purposes. However, even after the State filed its appellate brief and put Defendant on notice of the State's argument that Defendant waived this issue, Defendant never filed a reply brief (even after seeking an extension to file one) or a motion to supplement the appellate record with the missing disk, nor did he take any other action to prevent the waiver of this issue. Furthermore, Defendant failed to identify which statements in the recording were allegedly exculpatory *Brady* material or served as impeachment. His brief engaged in conclusory assertions that Donna's statement "exonerated the Defendant/Appellant of any act in the commission of this crime, and implicated her husband, Co-Defendant Watford instead." Defendant also failed to engage in *any* legal analysis establishing that Donna's recorded statements constituted material *Brady* evidence in light of the evidence at trial. *See State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *see also State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995) (burden on the Defendant to establish l) that the defendant requested the information; 2) that the State suppressed the information; 3) that the information was favorable to the accused; and 4) that the information was material).

In its written order denying Defendant's motion to compel, the trial court specifically noted that it considered the video recording of Donna's statement when determining whether the discovery in question was exculpatory and subject to the *Brady* rule. Due to Defendant's failure to adequately prepare the record on appeal, we are not privy to that recording and, therefore, cannot fully consider the propriety of the trial court's determination. Thus, this issue is waived.

Sufficiency of the Evidence. Finally, Defendant asserts that the "jury verdict was against the weight of the [evidence] presented at trial." In the portion of his brief related to this issue, Defendant only cites to one case—*State v. Crawford*, 225 Tenn. 478 (Tenn. 1971)—for the proposition that "Criminal convictions, premised entirely on circumstantial evidence must be proven by facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis.'" Defendant also claims that "loose ends were never investigated" to support his conclusion that "the standard set forth in

*Crawford* has not been met, and the State has not proven beyond a reasonable doubt nor that [sic] nor has the State excluded every other reasonable hypothesis. . . . Hence, the evidence presented at trial outweighed the jury verdict."

First, we note that the testimony of Ford, Colby, and Warren was direct, not circumstantial evidence. But Defendant's argument also fails because *Crawford* has not been the standard in Tennessee for more than a decade. In 2011, our supreme court abrogated *Crawford* and adopted the federal standard for determining whether circumstantial evidence is sufficient to support a conviction, holding that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011); *see also State v. Adams*, 405 S.W.3d 641, 662 (Tenn. 2013) ("In *Dorantes*, this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State."). The larger problem is as the State points out—Defendant's "blanket challenge to 'the jury verdict' was not sufficiently supported by argument, citation to authority, or a statement of the standard of review." Nor does Defendant even say which "verdict" he is challenging or why.

As with other issues in this case, Defendant's brief has failed to comply with Tennessee Rule of Appellate Procedure 27(a)(7), thus he has waived our consideration of sufficiency of the evidence supporting his convictions. *See also* Tenn. Ct. Crim. App. R. 10(b); *State v. Johnson*, No. E2021-01106-CCA-R3-CD, 2023 WL 3535344, at *7 (Tenn. Crim. App. May 18, 2023) (A defendant who "briefly mentions the issue and does not support his claim with argument, citation to relevant legal authority, or references to the record" waives that issue.). Defendant's failure to adequately brief this matter results in waiver of the issue on appeal. *See Cunningham*, 2024 WL 3634259 at *2-3. Regardless, from our independent review of the record, we conclude that the evidence was sufficient to sustain all four of Defendant's convictions. Accordingly, he is not entitled to relief on this issue.

## III. CONCLUSION

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
MATTHEW J. WILSON, JUDGE